United States District Court
Southern District of Texas
**ENTERED**
March 28, 2024
Nathan Ochsner, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

-----------------------------------------------------------------

**TROJAN BATTERY COMPANY, LLC**

     Plaintiff,

   -v-           Civil Action No. 4:21-cv-3075

**TROJAN EV, LLC and GOLF CARTS
OF CYPRESS, LLC**

     Defendants.

-----------------------------------------------------------------

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

  This case came on for a bench trial on Feb. 6, 2023 and concluded on Feb. 15, 2023. All the Parties were present at trial. The Court has carefully considered the testimony of the witnesses, the exhibits entered into evidence, and the entire record, and hereby enters the following conclusions of fact. To the extent any conclusion of fact may be construed as a conclusion of law (or vice versa), the Court hereby adopts it as such.


### INTRODUCTION

  1.  Plaintiff, Trojan Battery Company, filed this action on September 21, 2021. ECF No. 1.

  2.  Plaintiff asserts four claims against Defendants Trojan EV, LLC and Golf Carts of Cypress, LLC: Lanham Act Trademark Infringement under 15 U.S.C. § 1114 (Count I); Lanham Act Unfair Competition under 15 U.S.C. § 1125(a) (Count II);

Common Law Unfair Competition under Texas law (Count III); and Common Law Trademark Infringement under Texas law (Count IV).

3.      In summary, the Court finds as follows:

    a.   Defendant Trojan EV, LLC is found liable under Counts I-IV based on its infringement of Trojan Battery Company's registered and common law trademarks for TROJAN, TROJAN BATTERY SALES, and the  logo.

    b.    Defendant Golf Carts of Cypress, LLC is found liable under Counts I-IV based on its infringement of Trojan Battery Company's registered and common law trademarks for TROJAN, TROJAN BATTERY SALES, and the  logo.

    c.   Defendants are permanently enjoined from further infringement of Plaintiff's trademarks, as set forth in the separately filed Permanent Injunction.

    d.   Disgorgement of Defendants' profits is necessary and appropriate to make Defendants' infringement unprofitable, avoid unjust enrichment, and deter future willful infringement.

    e.   The Court awards infringer profits under 15 U.S.C. § 1117(a) in favor of Trojan Battery and against Trojan EV, LLC in the amount of $4,752,517, which represents revenues earned through October 13, 2022. The Court finds that Trojan EV has failed to meet its

burden under the Lanham Act to prove any costs or deductions from its revenues under 15 U.S.C. § 1117(a).

f.  The Court awards infringer profits under 15 U.S.C. § 1117(a) in favor of Trojan Battery and against Golf Carts of Cypress, LLC in the amount of $4,534,906, which represents revenues earned through October 2022. The Court finds that Golf Carts of Cypress has failed to meet its burden under the Lanham Act to prove any costs or deductions from its revenues under 15 U.S.C. § 1117(a).

g.  Trojan EV, LLC  shall produce within 7 days documents sufficient to calculate their respective revenues from October 13, 2022 (the date of the experts' analyses) through the date that the injunction is to take effect.

h.  Golf Carts of Cypress, LLC shall produce within 7 days documents sufficient to calculate their respective revenues from October 1, 2022 (the date of the experts' analyses) through the date that the injunction is to take effect.

i.  The parties shall make within 30 days after the Defendants' production referred to above a joint submission identifying the additional revenues subject to disgorgement, and identifying any disagreements that need to be resolved by the Court.

## **FINDINGS OF FACT**

### **Trojan Battery Company and Its Trademarks**

4.     Plaintiff, Trojan Battery Company ("Trojan Battery"), manufactures and sells "deep-cycle" batteries throughout the United States and the world. batteries sold throughout the world, but North America is the "great majority" of the business).

5.     Deep-cycle batteries are designed to deliver consistent power over an extended period of time before being recharged for another cycle.

6.     Among other uses, deep-cycle batteries can be used to power electric golf carts.

7.     Trojan Battery sells multiple batteries that can be used in electric golf carts. Trojan's three most popular batteries for that purpose are the TROJAN® T-105, the T-875, and the T-1275. The T-875, which is an 8-volt battery, is used almost exclusively in golf carts and other low-speed electric vehicles, the T-105 and T-1275 are used in golf carts and also have some other applications. Each of these batteries is labeled with the word TROJAN along with other Trojan Battery branding

8.     Trojan Battery sells three main types of batteries for use in golf carts: lead-acid, absorbent glass mat ("AGM"), and lithium-ion.  Of these types, lead-acid is the cheapest and most popular, but requires on-going maintenance to maintain the water level in the battery. Lithium-ion is a newer technology that is becoming more popular. Lithium batteries do not require maintenance and can last longer than lead-acid batteries. Lithium batteries are, however, more expensive than lead-acid batteries.

9.     Trojan Battery has manufactured lead-acid batteries for decades for use in golf carts and other industries, such as aerial work platforms and forklifts. Trojan Battery

launched a new lithium-ion battery directed specifically at golf applications in January 2022.

10.     Trojan Battery is part of C&D Technologies (often now called C&D/Trojan). C&D manufactures batteries for mostly stationary applications, while Trojan batteries are used in "motive" applications—i.e., anything that moves.

11.     The golf industry is the most important part of Trojan Battery's business. The vast majority of Trojan Battery's sales of TROJAN® batteries—and hundreds of millions of dollars of sales per year—are of batteries used mainly in golf carts.

12.     In total, Trojan Battery sales total 3.5-4 million individual batteries per year in North America, with "a great majority of those being Trojan-branded products in golf carts."

13.     Trojan Battery owns the following three trademark registrations at issue in this case, all of which include the word TROJAN:

      a.   U.S. Registration No. 1,813,578 for the mark TROJAN ("TROJAN® Word Mark"), which has a date of first use of Jan. 01, 1925, registered on December 28, 1993, and is incontestable.  The goods listed in the registration are "electric storage batteries." JTX-1

      b.   U.S. Registration No. 5,182,780 for the mark TROJAN BATTERY SALES ("TROJAN BATTERY SALES® Word Mark"), which has a date of first use of January 27, 2017 and which registered on April 11, 2017.  The goods listed in the registration are "Retail and wholesale store services and wholesale distributorships featuring

Deep Cycle Batteries, AGM Batteries and Deep Cycle Batteries,

Auto and Commercial Starting Batteries, Marine Batteries, Lawn

and Garden Starting Batteries, Motorcycle Batteries, Acid Pack

Batteries, SLA Batteries, Battery Chargers, Watering Kits for

batteries, Seat Kits for batteries, Cables, and Battery Testers."

c. U.S. Registration No. 5,951,233 for the mark ,

("TROJAN® Logo Mark") which has a first date of use of Dec. 07,

2018 and which registered on December 31, 2019.  The goods listed

in the registration are "electric storage batteries; deep cycle electric

storage batteries; lithium ion batteries."

14.     Trojan Battery uses the TROJAN® Word Mark and the TROJAN® Logo

Mark on batteries and in connection with its sale of batteries, including golf cart batteries.

15.     Trojan Battery also uses the word TROJAN® standing alone to refer to its

batteries and business. Moreover, the trial record reflects that third-parties, including the

Defendants, identify TROJAN® branded batteries by the single word: Trojan.

16.     Trojan Battery uses the TROJAN BATTERY SALES® Word Mark

through its wholly owned subsidiary Trojan Battery Sales, which uses the mark in

connection with the sale of batteries (both TROJAN® branded and non-TROJAN) as a

master distributor for Trojan Battery. For simplicity, these findings use the term

"TROJAN® Marks" to refer to the group of Plaintiff's trademarks that include the word

element TROJAN.

6

17.     The word TROJAN is the "most important" part of the TROJAN® brand and what the company "lead[s] with" because it is "so recognizable" and it is how Trojan Battery customers and dealers refer to the brand.

**Sales Channels for TROJAN® Batteries**

18.     Trojan Battery sells TROJAN® batteries in two primary ways.  First, Trojan Battery Company sells directly to certain "original equipment manufacturers," or OEMs, who install TROJAN® batteries into their products (golf carts, as relevant here). The OEM side makes up about 30% of Trojan Battery's business. *Id.* Second, Trojan Battery Company sells to certain "Master Distributors" who act as wholesalers by selling TROJAN® batteries to retail stores in what is called the "aftermarket."

19.     TROJAN® batteries command a dominant share of the OEM market for golf cart batteries—more than 80%.

20.     Trojan Battery' position in the OEM market is in large part a product of its relationships with the "big three" golf cart manufacturers—Yamaha, Club Car, and EZ-GO.  All three of those companies have agreements for Trojan Battery Company to supply 100% of their requirements of lead-acid batteries. Lead-acid batteries have traditionally been the dominant battery used in golf carts and have been around the longest and are the most recognizable in the industry.

21.     Lead-acid batteries used to constitute "almost all" of the golf cart battery market, but newer lithium-ion batteries have become popular in the last five years. Now, Mr. Pigott, the Vice President of Sales for North America for Trojan Battery, estimates that for OEM golf carts the ratio is about 50/50 lead-acid batteries to lithium-ion

batteries. In the aftermarket, lead-acid is still the most common technology, but lithium-ion is growing.

22.     Trojan Battery's relationship with Yamaha, for example, goes back over a decade. It provides that "Trojan will sell Trojan branded batteries" for "Yamaha brand golf cars in unit volumes equal to one hundred percent (100%) of [Yamaha's] unit purchases."

23.     Trojan Battery also sells to smaller golf cart OEMs who use its batteries the same way as the "big three" by installing them in new golf carts that are sold or leased to retailers, golf courses, and other customers. These "tier two" OEMs are "smaller golf cart manufacturers" who are supplied by Trojan Battery master distributors.

24.     The OEM market accounts for approximately 30% of Trojan Battery's TROJAN® branded golf business.

25.     Sales to Master Distributors in the "aftermarket"—i.e., batteries to be purchased separately at retail and not pre-installed in golf carts—account for about 70% of Trojan Battery's sales of TROJAN® batteries.

26.     Trojan Battery's master distributors each have an "exclusive" territory in which the master distributor is required to market only TROJAN® branded batteries for applications in which Trojan Battery has an offering. This includes, for example, golf cart batteries (for which Trojan Battery sells several TROJAN® batteries), but not automotive starter batteries (for which Trojan Battery does not sell a TROJAN® battery).

27.     TROJAN® batteries, including golf batteries, are a premium product as compared to the competition, and are typically sold at a 15-25% premium over the price of competitive batteries.

28.     Trojan Battery has been selling products in the aftermarket through master distributors since long before this case began.

29.     Trojan Battery uses the master distributor model to help maintain TROJAN® batteries as the premium brand in the market. Master distributors employ sales teams that Trojan Battery can train on the features and advantages of TROJAN® batteries. The master distributors can then better sell TROJAN® batteries to retailers and provide the level of service to retailers that those stores expect of a premium brand.

30.     Having master distributors exclusively sell TROJAN® branded batteries in their territories in the golf cart space allows the master distributors to ensure proper product training and attention for TROJAN® branded products.  In effect, Trojan Battery hires the master distributor's sales team to learn about its products and promote them in the market to maintain its position in the market.

31.     In addition, Trojan Battery employs a sales team that works with master distributors to provide support and training. Among other duties, these employees go on "ride-alongs" with master distributors to visit retail customers that sell or may wish to sell TROJAN® batteries.

32.     As part of their job, Trojan Battery sales personnel spend much of the year on the road visiting face-to-face with retailers to promote TROJAN® batteries.  Rick Sanders, a national account manager for Trojan Battery, estimated that he visits

approximately 1,000 retail stores per year. Consistent with Trojan Battery's focus on the golf cart industry, Mr. Sanders testified that he spends more than 80% of his time focused on sales of TROJAN® batteries to retail stores that sell golf carts.

33.     Trojan Battery also supplies TROJAN® branded literature and point-of-sale marketing materials to master distributors to use to learn about and promote TROJAN® batteries. Trojan Battery also provides a website for its dealers and master distributors to use to order or download TROJAN® product literature and sales materials.

34.     It is important to train master distributors and retail dealers on TROJAN® batteries and to promote the TROJAN® brand face-to-face with retailers because, as a premium brand, TROJAN® batteries are more expensive than their competitors. The selling points of TROJAN® batteries are its better technology and quality, along with the history and reputation of the brand.

35.     To take a recent example, in January 2022, Trojan Battery launched a new lithium-ion battery designed specifically for the golf cart market. Lithium-ion batteries are a new entrant into the golf cart battery market (within the last several years). Trojan Battery spent years developing its lithium-ion golf battery in order to ensure that the company "got it right" and could launch a product consistent with the premium reputation of the TROJAN® brand



.

36.     In conjunction with that launch, Trojan Battery offered training programs to its master distributors to educate them on lithium-ion technology and Trojan Battery's approach to it. Master distributors who completed the training were able to promote themselves as lithium-ion certified master distributors:



37.     Trojan Battery also launched a marketing campaign specific to its lithium-ion golf battery, as described in more detail below, to announce the new product offering and raise its profile in the market.

38.     The aftermarket for golf cart batteries is important because the life of a golf cart's batteries may be as little as 3-5 years, while the golf cart may have a useful life of 15-20 years. Thus, someone who owns a golf cart will have to buy new TROJAN® batteries 5-6 times (or competitive batteries up to 10 times).

39.     Customers often return to the retailer that sold their golf cart to buy replacement batteries; virtually all golf cart retailers have service departments for golf carts that include services like replacing batteries.

40.     Defendant Golf Carts of Cypress, for example, is a golf cart retailer whose website includes a "service" page that refers to the need for "replacement batteries" and contains two images of golf cart battery compartments. Golf Carts of Cypress keeps the page up to this day, even though its owner, Federico Nell, testified that Golf Carts of Cypress no longer performs golf cart service.

41.     TROJAN® batteries also have a dominant position in the aftermarket—more than 50% of the golf cart batteries sold in the aftermarket are TROJAN® branded. Put simply, the evidence supports that TROJAN® branded batteries account for more than half of all the golf cart batteries sold at retail in the country.

42.     Trojan Battery has been incredibly successful in selling TROJAN® branded golf cart batteries. Trojan Battery sells hundreds of millions of dollars worth of TROJAN® golf cart batteries per year, equating to millions of units.

43.     Trojan Battery's new lithium-ion golf cart battery, launched in January 2022, has not yet reached the hundreds of millions in sales that are typical of its most popular TROJAN® branded golf cart batteries. However, in the roughly 16 months after launch, Trojan Battery sold millions of dollars worth of its TROJAN® lithium-ion battery and has marketed it heavily, as discussed in more detail below.

**Retail Dealers of TROJAN® Batteries**

44.     TROJAN® batteries are sold at thousands of retail stores throughout the United States.

45.     Many TROJAN® battery dealers are retailers of golf carts.[1]

46.     Contrary to Defendants' position, Trojan Battery does not have "nine customers." Retailers who purchase TROJAN® batteries are Trojan Battery customers, as are the end-users who buy batteries from retailers for use in their golf carts .

47.     Retailers who sell TROJAN® batteries often promote their status as a TROJAN® dealer.

48.     For example, some retailers display point-of-sale materials in their store or hang banners featuring the TROJAN® Logo, such as the following sign at B&W Golf Cars, which is an authorized dealer for both Trojan Battery and Trojan-EV.

---

[1] The Court does not find persuasive the Defendants' contention, based purely on the 244 dealers with the word "golf" in their name on Trojan Battery's dealer locator,  that TROJAN® battery dealers in fact make up a small percentage of golf cart retailers in the U.S. First, the large market share of TROJAN® batteries in the golf cart market is undisputed. Second, the trial demonstrated that many golf cart retailers do not have "golf" in their name, such as Nashville Powersports, East Central Sports, and Mid-America Customs. In any event, even if there were only 244 golf cart retailers in the U.S. who are authorized TROJAN® battery dealers, that is still a large number of retail locations selling TROJAN® batteries and golf carts at the same location.



49.     Other dealers promote themselves as TROJAN® battery dealers in print magazines directed to the golf carting community, such as this advertisement in the May 2022 issue of *Golf Car Options Magazine*:



The May 2022 issue of Golf Car Options Magazine also included advertisements from both Trojan Battery and Trojan-EV. In fact, "Trojan EV" and "Trojan Battery" are listed side-by-side in the "advertiser listing" of that magazine.

**Marketing Channels for TROJAN® Batteries**

50.     Trojan Battery markets its TROJAN® batteries through a number of different channels directed at retail dealers and end-consumers in the golf and golf cart industry.

51.     Trojan Battery advertises its TROJAN® batteries on its website, trojanbattery.com. Trojanbattery.com includes features that allow potential customers to locate an authorized dealer of TROJAN® batteries.

52.     Trojan Battery also advertises its products through social media directed to potential customers and retailers, such as through its Instagram, Linkedin, and Facebook pages. Several images on those platforms feature pictures of golf carts.

53.     Trojan Battery also advertises through billboards, such as two billboards that were situated in the Villages community in Florida and that promoted a TROJAN® lithium-ion golf cart battery that Trojan Battery launched in January 2022:



Notably, the trojanbeast.com link, which is used to track engagement with billboards, had over 1,100 clicks from the two billboards on which it was used over the course of just six months.

54.     Trojan Battery also attends trade shows to promote TROJAN® batteries with a specific focus on the golf industry, such as the PGA show, which Trojan Battery attends every year to market to its customers:



Mr. Pigott explained that the PGA show is the "largest golf show every year," and that in addition to OEM golf cart manufacturers, "you have consumers and everything to do with golf there . . . [s]o it's a big market for us."

55.     Trojan Battery also attends the Golf Course Superintendent's Association of America tradeshow, which is focused primarily on golf courses. Golf courses are often customers of golf cart OEMs (like the big three who use TROJAN® golf batteries), and they often use utility vehicles of the type that can be powered by TROJAN® batteries:



56.   Trojan Battery also provides literature and support to master distributors and retailers in order to promote TROJAN® batteries to end-users. As explained above and herein, much of this literature is specific to the golf industry and retailers often display it in their stores, such as this display at B&W Golf Cars:



57.     Trojan Battery also advertises in print and online publications directed

specifically to the golf industry. While Trojan Battery's advertisements have appeared in

many publications over the years, two specifically relevant to this case are Golf Car

Options and Golf Carting Magazine. The Court admitted three exhibits showing Trojan

EV and Trojan Battery advertisements in the same issue of these publications:







58.     In addition, Trojan Battery had a cover story in the October 2022 issue of

Golf Car Options Magazine:



4:21-cv-03075
Plaintiff's Trial Exhibit
**PTX 170**

TROBAT0000850
PTX 170-0001

23

59.     Trojan Battery has advertised in similar golf magazines for years.

**Trojan EV and Golf Carts of Cypress**

60.     Federico Nell is the owner of both Trojan EV, LLC and Golf Carts of Cypress, LLC.

61.     Mr. Nell began customizing and selling golf carts around February 2019.

62.     Mr. Nell founded Golf Carts of Cypress in August 2019. Golf Carts of Cypress's original business was selling used Club Car, EZ-GO, and Yamaha golf carts that were refurbished and customized for resale.

63.     Golf Carts of Cypress sold (and continues to sell) golf carts at a physical showroom in Cypress, Texas.

64.      Golf Carts of Cypress also partially owns a second location in League City, Texas where it sells golf carts. The League City location is also partially owned by a company Mr. Nell named "Taylor Made Golf Carts."

65.     Golf Carts of Cypress also sells golf carts on its website at golfcartscypress.com. Customers can order golf carts on the website and have them shipped throughout the continental United States.

66.     In its early days, Golf Carts of Cypress also sold customized golf carts from a dealer named Caddy Shack, which made golf carts that looked like classic cars. For example, Caddy Shack made golf carts that looked like a Ford Mustang.

67.     Caddy Shack had a license to sell carts using the logos of the car manufacturers, and Golf Carts of Cypress got the benefit of that license in order to allow it to re-sell the carts.

68.     Mr. Nell understood that, without a license from Ford, he could not have sold a golf cart with the Ford logo on it.

69.     Golf Carts of Cypress also advertises a service department that can assist with such activities as "replacement batteries." Golf Carts of Cypress did employ certified mechanics with "years of working with all brands of golf carts."

70.     The Golf Carts of Cypress service page was posted to the internet in 2019 or early 2020. The page features pictures of two golf cart battery compartments, one of which contains maroon TROJAN® batteries.

71.     Golf Carts of Cypress has, in the past, sold golf carts that included TROJAN® batteries.

72.     In October 2020, Mr. Nell founded Trojan EV, LLC to act as a wholesaler of electric golf carts branded as Trojan-EV.

73.     Trojan EV sells golf carts to end consumers through a network of "authorized dealers" who it allows to use the Trojan EV name and logo and to sell golf carts that are purchased from Trojan EV.

74.     Trojan EV signed its first authorized dealer agreement on February 5, 2021 with Golf Carts of Cypress.

75.     Golf Carts of Cypress is an authorized dealer of Trojan EV as well as other brands owned by Federico Nell, such as EV Titan and Spartan EV, and advertises that fact on its website:





76.     Trojan EV also has a website to market the Trojan EV brand and to attract

new potential authorized dealers:



77.     The Trojan EV website includes "Become a Dealer" links that visitors can click to send a message to Trojan EV expressing interest in becoming an authorized dealer.

78.     Messages sent through this link go to an info@trojanev.com email address owned by Trojan EV and accessible by Mr. Nell and another Trojan EV employee, Shelly Tavares.

79.     The Trojan EV website also includes a "Contact Us" form that website visitors can use to send a message to Trojan EV. Again, messages sent through this link go to the info@trojanev.com email address.

**Trojan-EV Model A Golf Carts: January 2021-November 2021**

80.     On October 22, 2020, Trojan EV communicated to an overseas manufacturer (known as Foshan Shunde Green Motor Technology ("Green Motor")) that "Trojan EV is the name" that it would use on its golf carts.

81.     On November 1, 2020, Trojan EV communicated to Green Motor that it would be using a Trojan EV logo that is the same as the logo it continues to use today:



82.     Originally, purchases by Trojan EV from Green Motor were of Green Motor's "Model A" cart, which is a model that Green Motor offers to others. The first orders of the Model A Trojan-EV carts had the name on the front and side with a sticker:



EXHIBIT
P032

4:21-cv-03075
Plaintiff'sTrial Exhibit
PTX 223

PTX 223-0001

83.     Trojan EV and Golf Carts of Cypress began selling these Model ATrojan

EV golf carts in the United States in January 2021.

84.     After the first 18 Model A golf carts, Golf Carts of Cypress began to

"customize" the carts in various ways by adding different features.. In addition, for

Trojan EV, Green Motor added black decals to the Model A that included the Trojan EV

logo:



85.    The Trojan EV decal is on several places on the cart, including the front, as in this photo of the model A Trojan EV at B&W Golf Cars:



86.     Trojan EV also began molding the name Trojan-EV into multiple places on the golf cart both visible and not visible to consumers, such as the "underside of the front cowl, on the inside of the back cowl, on the battery compartment," "on the wheels," "on the steering wheel," "on the dash," "on the speedometer," "on the floorboard," and on the "front and rear seats."

87.     In July 2021, Bill Malloy, the owner of Nashville Powersports, which sells electric golf carts, visited the Trojan EV website and clicked "Become a Dealer."

88.     When Mr. Malloy first visited the Trojan EV website he "thought they were part of Trojan Battery" and "didn't think [the carts] were that attractive."

89.     Mr. Malloy realized after further inspection of the Trojan EV website "that they weren't the same company, the contact information was different, very different companies."

90.     On July 29, 2021, at 11:09 a.m., Mr. Malloy received a solicitation email from Trojan EV shortly thereafter saying that "[w]e would like to invite you in becoming a dealer for Trojan-EV!"

91.     Mr. Malloy forwarded the email to Rick Sanders, a sales employee at Trojan Battery, the same day. Mr. Malloy's message read:

> I though[t] this might be you guys for a minute… Thankfully it's not, ugly carts..
>
> Tel;l [*sic*] them the Trojan name is taken! ha

92.     Mr. Sanders forwarded the email to Bob Pigott, Trojan Battery's Vice President of Sales for North America, on the same day. Mr. Pigott sent the email to Trojan Battery's in-house lawyers.

93.     On July 30, 2021, Trojan Battery's outside counsel sent a cease and desist letter to Trojan EV and Golf Carts of Cypress asserting Trojan Battery's trademark rights and demanding that they stop using the Trojan EV name to sell electric golf carts.

94.     Neither Trojan EV nor Golf Carts of Cypress ceased use of the Trojan EV name after receiving the cease and desist letter.

95.     On September 21, 2021, Trojan Battery filed this lawsuit against Trojan EV and Golf Carts of Cypress..

96.     Neither Trojan EV nor Golf Carts of Cypress ceased use of the Trojan EV name after this lawsuit was filed.

97.     At the time Defendants received Plaintiff's cease and desist letter in July 2021, the only Trojan-EV golf carts they sold were the Model A with customizations.

**Trojan EV Launches the Trojan-EV-X: April 2022-Present**

98.     Approximately four months after receiving Trojan Battery's cease and desist letter, and after this lawsuit was filed, Trojan EV began working with a manufacturer in China called Top Golf to design a new Trojan EV golf cart, to be named the Trojan-EV-X.

99.     Mr. Nell was "forced" into this decision because the manufacturer of the Model A Trojan-EV cart made that model exclusive to one of Mr. Nell's competitors.

100.    Trojan EV began shipping the Trojan-EV-X to its authorized dealers, including Golf Carts of Cypress, around April of 2022.

101.    The Trojan-EV-X has a different look than the model A Trojan-EV, and includes several pieces specifically molded and manufactured to have the Trojan EV name on them, such as on the side panel and the front brush guard as shown in promotional pictures on the website for Prosper Golf Carts, an authorized Trojan-EV dealer:





102.    Trojan EV and Golf Carts of Cypress have sold the Trojan-EV-X since

April 2022. For example, the Golf Carts of Cypress website has numerous Trojan EV-X

golf carts listed for sale along with the type of battery used in each:



## Trojan EV Authorized Dealers

103.    Trojan EV dealers receive a "limited, non-exclusive, royalty-free right" to use the Trojan EV "Trademarks" to promote the sale of Trojan EV golf carts.

104.    Many of Trojan EV's dealers do promote Trojan EV golf carts on their websites, such as Prosper Golf Carts:

105.   Prosper Golf Carts also identifies the types of batteries included in its

Trojan EV golf carts:

**Golf Cart Batteries**

  



106.    Likewise, Prosper Golf Carts touts the long range of "Trojan's battery packs," which it claims "provide excellent runtime on a single charge and longevity that means your Trojan EV will be a dependable companion for years to come."

107.    Mr. Nell testified that he had the right to control what Trojan EV dealers put on their websites, which is consistent with Section 13 of the Prosper Golf Carts dealer agreement, which "obtain [Trojan EV's] prior written consent to use the Trademarks in catalogues, promotional materials, and advertising materials."

108. Trojan EV has several authorized dealers that overlap with Trojan Battery, despite Trojan EV's limited footprint. The evidence showed that the following dealers are both Trojan Battery and Trojan EV authorized dealers:

  a. B&W Golf Cars,

  b. Indian River Golf Cars,

  c. BMK Golf Carts, (Trojan Battery dealer)

  d. Mid-America Customs,

  e. Back9 Golf Cars,

109. Other than Golf Carts of Cypress, the Trojan EV retailers that have generated the most revenue (as of October 2022 when Trojan EV produced the information) were all Trojan Battery dealers: B&W Golf Cars, Indian River Golf Cars, and BMK Golf Cars.

110. Trojan EV advertises its Trojan EV and Trojan-EV-X golf carts on its website and social media, such as Instagram.

111. Golf Carts of Cypress likewise advertises on its website and on social media like Instagram.

112. Trojan EV markets the Trojan-EV brand in print and online magazines such as Golf Carting Magazine and Golf Car Options Magazine.

113. Golf Carts of Cypress has also promoted its brand in Golf Carting Magazine. For example, it had a cover story in Golf Carting Magazine in November 2020.

114.    Since that time, Trojan EV and Trojan Battery have both advertised in several issues of Golf Carting Magazine, as well as Golf Car Options Magazine, another publication directed to the golf carting community. A number of these advertisements have been in the very same issues.

115.    Defendants note that "prior to 2022" the parties did not overlap in their advertising in Golf Carting or Golf Car Options magazine. However, Trojan EV has only sold golf carts since January 2021.

116.    Defendant Trojan EV purchased additional Trojan EV advertising in Golf Car Options in July of 2022, PTX 99, and purchased an additional two years of Trojan EV advertisements in Golf Carting Magazine in June 2022.

**Messages Received Through the Trojan-EV Website Mentioning Trojan Battery**

117.    Trojan EV received multiple email communications through the "Become a Dealer" and "Contact Us" forms on its website that mentioned Trojan Battery.

## CONCLUSIONS OF LAW

1.    Plaintiff asserts four claims: First, federal trademark infringement under 15 U.S.C. § 1114(1); second, federal unfair competition under 15 U.S.C. § 1125(a); third, common law unfair competition under Texas law; fourth, common law trademark infringement under Texas law.

**The Nature of a Trademark**

2.    A trademark includes "any word, name, symbol, or device, or any combination thereof . . . used by a person . . . to identify or distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the

source of the goods, even if that source is unknown." 15 U.S.C. § 1127 (definition of "trademark").

3.      Put more simply, "a trademark is not a trademark unless it identifies a product's source (this is a Nike) and distinguishes that source from others (not any other sneaker brand)." *Jack Daniel's Props, Inc. v. VIP Prods. LLC*, 599 U.S. ---, 2023 WL 3872519, at *3 (June 8, 2023).

4.      In serving their source-identifying function, "trademarks benefit consumers and producers alike. A source-identifying mark enables customers to select 'the goods and services that they wish to purchase, as well as those they want to avoid.'" *Jack Daniel's*, 2023 WL 3872519, at *4 (quoting *Matal v. Tam*, 382 U.S. 218, 224 (2017)). Thus a trademark "quickly and easily assures a potential customer that this item—the item with *this* mark—is made by the same producer as other similarly marked items that he or she liked (or disliked) in the past." (quoting *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 164 (1995) (internal quotation marks omitted)).

5.      In addition to protecting consumers, trademarks benefit the producer by ensuring that the trademark owner "will reap the financial rewards associated with the product's good reputation." *Jack Daniel's*, 2023 WL 3872519, at *4.

**<u>Trademark Infringement and Unfair Competition Under the Lanham Act</u>**

6.      15 U.S.C. § 1114(1) provides that:

Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with

which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) hereof, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.

7.      15 U.S.C. § 1125(a)(1)(A) provides that:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

8.      15 U.S.C. § 1114(1) applies to infringement of *registered* trademarks.

*Exxon Corp. v. Texas Motor Exchange of Houston, Inc.*, 628 F.2d 500, 504 (5th Cir.

1980).

9.      In contrast, among the claims encompassed by 15 U.S.C. § 1125(a)(1)(A),

also called Section 43(a) of the Lanham Act, are actions for infringement of *unregistered*

trademarks, also called common law trademarks. 15 U.S.C. § 1125(a); *Two Pesos, Inc. v.*

*Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992) (Section "43(a) [1125(a)] protects qualifying unregistered trademarks").

10.     As to Trojan Battery's claims for trademark infringement and unfair competition under Texas Law, "[a] trademark infringement action under Texas common law is analyzed in the same manner as a Lanham Act claim." *Viacom Int'l v. IJR Capital Investments, L.L.C.*, 891, F.3d 178, 185 (5th Cir. 2018).

11.     Trademark infringement liability requires Trojan Battery to prove two elements: (1) ownership of a legally protectable mark and (2) a likelihood of confusion created by an infringing mark. *Alliance for Good Government v. Coalition for Better Government*, 901 F.3d 498, 505 (5th Cir. 2018).

12.     Trojan Battery bears the burden of proving trademark infringement by a preponderance of the evidence. *Pizza Hutt, LLC v. Ronak Foods, LLC*, 2022 WL 3544403, at *43 (E.D. Tex. 2022); *Waples-Platter Cos. v. Gen. Foods Corp.*, 439 F. Supp. 551, 574 (N.D. Tex. 1977).

13.     Likelihood of confusion is analyzed in the same manner for unregistered trademarks as for registered trademarks. *Viacom Int'l*, 891 F.3d at 191-92; *RE/MAX Int'l, Inc. v. Trendsetter Realty, LLC*, 655 F. Supp. 2d 679, 711 (S.D. Tex. 2009).

**Ownership of Trademark Rights**

14.     "A mark need not be registered in order to obtain protection, because "[o]wnership of trademarks is established by use rather than by registration." *Bd. of Supervisors for Louisiana State Univ. Agricultural & Mech. College v. Smack Apparel*

*Co.*, 550 F.3d 465, 475 (5th Cir. 2008). However, registration confers certain presumptions as to ownership.

15.     Ownership of a trademark registration is "prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or service specified in the registration." 15 U.S.C. § 1115(a).

16.     Once a registration has been in use for five consecutive years, the owner can seek "incontestable" status. 15 U.S.C. § 1065. An incontestable registration is "conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce . . . on or in connection with the goods or services" in the registration. 15 U.S.C. § 1115(b); *American Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 330 (5th Cir. 2008).

17.     For unregistered trademarks, ownership is established "when goods bearing the mark are placed on the market." *Viacom Int'l v. IJR Capital Investments, L.L.C.*, 891 F.3d 178, 186 (5th Cir. 2018).

18.     An unregistered trademark is "protectable" if it is either inherently distinctive or has acquired distinctiveness through secondary meaning. *Viacom Int'l*, 891 F.3d at 189.

19.     The distinctiveness of a mark falls along a spectrum of distinctiveness: (1) fanciful, (2) arbitrary, (3) suggestive, (4) descriptive, and (5) generic. The first three

categories (fanciful, arbitrary, and suggestive) are inherently distinctive and thus entitled

to protection. Descriptive marks are protectable with a showing of secondary meaning.

Generic marks are never protectable. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763,

768-79 (1992).

20.     The parties dispute only whether Plaintiff's common law marks for

TROJAN and logos including TROJAN are arbitrary (Plaintiff's position) or suggestive

(Defendants' position). Since both arbitrary and suggestive marks are inherently

distinctive, the classification does not affect the ownership of Plaintiff's common law

marks for TROJAN.

21.     Based on its ownership of federal registrations, Trojan Battery has therefore

demonstrated ownership of the following registered trademarks:

   a.   U.S. Registration No. 1,813,578 for the mark TROJAN

        ("TROJAN® Word Mark"), which has a date of first use of Jan. 01,

        1925, registered on December 28, 1993, and is incontestable.  The

        goods listed in the registration are "electric storage batteries."

   b.   U.S. Registration No. 5,182,780 for the mark TROJAN BATTERY

        SALES ("TROJAN BATTERY SALES® Word Mark"), which has

        a date of first use of January 27, 2017 and which registered on April

        11, 2017.  The goods listed in the registration are "Retail and

        wholesale store services and wholesale distributorships featuring

        Deep Cycle Batteries, AGM Batteries and Deep Cycle Batteries,

        Auto and Commercial Starting Batteries, Marine Batteries, Lawn

and Garden Starting Batteries, Motorcycle Batteries, Acid Pack

Batteries, SLA Batteries, Battery Chargers, Watering Kits for

batteries, Seat Kits for batteries, Cables, and Battery Testers."

c.   U.S. Registration No. 5,951,233 for the mark  ,

("TROJAN® Logo Mark") which has a first date of use of Dec. 07,

2018 and which registered on December 31, 2019.  The goods listed

in the registration are "electric storage batteries; deep cycle electric

storage batteries; lithium ion batteries."

22.     Trojan Battery has further established ownership of protectable common

law rights in the trademark TROJAN and the logos ![logo] (e.g., PTX-7) and

![Trojan Battery Sales logo] based on its use of the mark on batteries and wholesale sales

activities for batteries, and specifically on golf cart batteries..

23.     Demonstrating ownership of a registered trademark does not require Trojan

Battery to show that its trademark rights "extend to golf carts" as a threshold matter, as

Defendants argue. Rather, ownership and likelihood of confusion are distinct elements,

and any inquiry into the relatedness of the parties' products is appropriately done as part

of the likelihood of confusion analysis. While the validity of a trademark extends only to

the goods and services listed in the registration or on which the plaintiff's mark is used,

infringement occurs not just when the defendant's mark is used on the goods listed in a

registration, but also when the defendant's mark is used on "any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a).

24.     Although ownership of a mark is limited to the goods and services in the registration, the Fifth Circuit has explained that "the remedies of the owner of a registered trademark are not limited to the goods specified in the certificate, but extend to any goods on which the use of an infringing mark is likely to cause confusion":

> Often and recently we have made plain that direct competition between the products is not a prerequisite to protective relief. The remedies of the owner of a registered trademark are not limited to the goods specified in the certificate, but extend to any goods on which the use of an infringing mark is 'likely to cause confusion. Confusion, or the likelihood of confusion, not competition, is the real test of trademark infringement. Whether or not direct competition exists is but one of the elements to be considered in determining whether there is or will be a likelihood of confusion.

*Continental Motors Corp. v. Continental Aviation Corp.*, 375 F.2d 857, 861 (5th Cir. 1967) (citations omitted)).

25.     Thus, "[i]nfringement of a registered trademark is defined by the likelihood of confusion test and is not limited to use on the goods or services for which the mark was registered." McCarthy on Trademarks & Unfair Competition § 24:65; *see also Applied Information Sciences Corp. v. eBay, Inc.*, 511 F.3d 966, 973 (9th Cir. 2007) ("By virtue of its federal registration, AIS discharged its burden of establishing the validity of the SmartSearch mark in connection with those goods listed in the registration. Whether eBay's use of SmartSearch infringed AIS's protected interest then becomes a question of *likelihood of confusion*."). *Applied Information Sciences* explained cogently the

distinction between ownership and infringement, relying on the Fifth Circuit's

*Continental Motors* decision:

> However, the scope of validity and the scope of relief for infringement are not coextensive. Although the validity of a registered mark extends only to the listed goods or services, an owner's remedies against confusion with its valid mark are not so circumscribed. The language of the infringement statute, 15 U.S.C. § 1114, does not limit remedies for allegedly infringing uses to those goods within the ambit of registration. . . . Thus a trademark owner may seek redress if another's use of the mark on different goods or services is likely to cause confusion with the owner's use of the mark in connection with its registered goods.

*Applied Information Sciences*, 511 F.3d at 971.

26.     Defendants identified two cases—both preliminary injunction decisions

from the Western District of Texas—that they argue have treated the scope of the

plaintiff's trademark registration as a threshold issue. *See Waterloo Sparkling Water*

*Corp. v. Treaty Oak Brewing & Distilling Co., LLC*, 2021 WL 5568159 (W.D. Tex. Nov.

28, 2021); *Violet Crown Cinemas, LLC v. Int'l Development Management, LLC*, 2022

WL 4282207 (W.D. Tex. Sept. 15, 2022). As an initial matter, these cases would be

unpersuasive even if they undertook the analysis Defendants contend. This court cannot

introduce new elements of trademark infringement not in the Lanham Act and that is not

supported by Fifth Circuit precedent. The Defendants have not identified any Fifth

Circuit caselaw that supports their argument.

27.     Moreover, the cases Defendants cite are better read as either a dispute over

priority—who had rights first—or as a garden variety likelihood of confusion analysis. In

*Waterloo*, the plaintiff had senior rights for sparkling water based on its 2017 federal

trademark registration, while the defendant had prior rights for alcohol based on its use

on gin since 2012 and based on its own federal trademark registration. *Waterloo Sparkling Water* 2021 WL 5568159, at *2. The court therefore concluded that the plaintiff "has failed to show that it has a senior mark for sparkling alcoholic beverages." *Id.* at *6. Therefore (again, at the preliminary injunction stage), the court held that the plaintiff was not likely to succeed in showing superior rights in the alcoholic beverage space. In this case, there is no priority dispute—all the parties agree that Plaintiff has prior registrations for its TROJAN® Marks.

28.    Although *Violet Crown* also purported to analyze whether the plaintiff's mark "extended" to the defendant's services as part of the ownership question, the analysis in context is more appropriately considered a likelihood of confusion analysis. *Violet Crown*, 2022 WL 4282207, at *3-4. The Court considered such factors as whether the mark was "strong outside the context" of the plaintiff's specific services, whether the parties' services were related because the defendant's services were in the plaintiff's "natural zone of expansion," and the third-party use of "violet crown" as a term for the city of Austin. *Id.* And again, it would have been in direct conflict with *Continental Motors* had the court actually sought to introduce as a new element of trademark infringement the requirement that the plaintiff show its trademark ownership "extends" to the defendant's infringing goods.

29.    Two other factors support the Court's analysis. First, the likelihood of confusion analysis already encompasses a relatedness of the products inquiry that can include whether the "junior user's services are in a market that is one into which the senior user would naturally expand." *Elvis Presley Enterprises, Inc. v. Capece*, 141 F.3d

188, 202 (5th Cir. 1998) (considering natural zone of expansion in the relatedness of products digit). Defendants' argument that the zone of expansion is a threshold inquiry is therefore inconsistent with binding Fifth Circuit law. Indeed, *Elvis Presley Enterprises* itself makes clear that the natural zone of expansion test is merely "[o]ne such relationship" between products that can be relevant to infringement, not a threshold test. *Id.*

30.    Second, Defendants' argument ignores that, so far as the Court is aware, no Fifth Circuit case has ever undertaken the inquiry Defendants propose, and numerous Fifth Circuit cases have found a likelihood of confusion despite a lack of direct competition between the parties' products and services. *See, e.g.*, *Viacom Int'l v. IJR Capital Investments, L.L.C.*, 891 F.3d 178, 193-94 (5th Cir. 2018) (likelihood of confusion between fictional hamburger restaurant and real-life seafood restaurant despite "little thematic overlap"); *Elvis Presley Enters.*, 141 F.3d at 191, 202-03 (analyzing zone of expansion under likelihood of confusion analysis and finding goods related despite the fact that "none of [plaintiff's] marks is registered for use in the restaurant and tavern business" in which defendant operated); *Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 598 (5th Cir. 1985) (finding use of mark on offset printing presses likely to be confused with plaintiff's mark on photographic material, without inquiring into zone of expansion); *Exxon Corp. v. Texas Motor Exchange of Houston, Inc.*, 628 F.2d 500, 505 (5th Cir. 1980) (car service stations likely to be confused with petroleum products, without zone of expansion analysis, because "[b]oth plaintiff and defendant are heavily involved in car care"); *Beef/Eater Restaurants, Inc. v.*

*James Burrough Limited*, 398 F.2d 637, 639 (5th Cir. 1968) (likelihood of confusion with use of similar trademarks on restaurants and gin); *Continental Motors*, 375 F.2d at 858-59 (likelihood of confusion as between manufacturer of aircraft engines and servicer of aircraft electronics and engines).

31.     Accordingly, consistent with *Continental Motors* and *Applied Information Sciences*, the Court concludes that Plaintiff has demonstrated ownership of trademark rights for its TROJAN® Marks (and common law marks containing the word TROJAN). The Court considers the relatedness of the parties' products and services below as part of the likelihood of confusion analysis.

**Trojan Battery Has Shown a Likelihood of Confusion**

32.     Likelihood of confusion is analyzed through eight non-exclusive "digits": (1) strength of the plaintiff's mark; (2) similarity of design between the marks; (3) relatedness of the products; (4) identity of retail outlets and purchasers; (5) similarity of advertising media used; (6) the defendant's intent; (7) actual confusion; and (8) degree of care exercised by potential purchasers. *Am. Rice, Inc.*, 518 F.3d at 329.

33.     A likelihood of confusion exists if a significant number of reasonable people are likely to be confused, mistaken, or deceived as to (1) the source of Defendants' products; (2) whether Plaintiff has authorized or approved of Defendant's use of TROJAN-EV on Defendants' products; or (3) whether Defendant is affiliated with or is sponsored by Plaintiff. *Streamline Production Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 457 & n.7 (5th Cir. 2017).

34.     The Court notes that it does not place any significance on the fact that Trojan Battery's trademark registrations do not use the word "golf" or "golf carts." Infringement is assessed based on how the marks are "perceived by consumers" and how they "appear in the marketplace," not based on the goods and services listed in the registrations. *See Elvis Presley Enters.*, 141 F.3d at 188 ("Courts consider marks in the context that a consumer perceives them in the marketplace, which includes their presentation in advertisements."); *Gibson Brands, Inc. v. Armadillo Distribution Enterprises, Inc.*, 2023 WL 2815156, at *25 (E.D. Tex. Apr. 6, 2023) ("To be sure, the Court understands that marks must be compared as they appear in the marketplace; they cannot be compared simply as they appear on their registration sheets.").

35.     Nor does the Court place any weight on the fact that, after Defendant Trojan EV filed trademark applications for the word TROJAN EV and the  logo, the examiner reviewed those applications and approved them for publication. There is no evidence that the USPTO examiner even considered the TROJAN® Marks in deciding whether to approve Defendant's applications for publication. And the Court took judicial notice at trial that Trojan Battery opposed Defendant's TROJAN-EV trademark applications and that the Trademark Trial and Appeal Board has put that opposition proceeding on hold pending the outcome of this case, and specifically because the Court's decision "may have a bearing upon the [opposition] proceeding and that the federal action may ultimately determine or have an impact on the parties' rights to their marks that are involved in the opposition proceeding."

51

**Digit 1: Strength of the Mark**

36.     "Generally, the stronger the mark, the greater the likelihood that consumers

will be confused by competing uses of the mark." *Board of Supervisors*, 550 F.3d at 479.

37.     The strength of a mark depends upon its classification along the spectrum of distinctiveness as well as its market recognition. *American Rice, Inc. v. Producers Mill, Inc.*, 518 F.3d 321, 330 (5th Cir. 2008); *Vesta Corp. v. Vesta Management Servs., LLC*, 2016 WL 8710440, at *5 (S.D. Tex. Sept. 30, 2016).

38.     As explained above, trademarks are categorized along the following range of generally increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful, with generic marks being the least distinctive and fanciful marks being the most distinctive. *Am. Rice*, 518 F.3d at 330.

39.     An arbitrary mark is one whose meaning "bears no relationship to the products or services to which they are applied." *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 791 (5th Cir. 1983).

40.     A suggestive mark "suggests, rather than describes, some particular characteristic of the goods or services to which it applies and requires the consumer to exercise the imagination in order to draw a conclusion as to the nature of the goods and services." *Zatarains, Inc.*, 698 F.2d at 791.

41.     The mark TROJAN is arbitrary for golf cart batteries because it does not describe or suggest any feature of Trojan Battery's products. A "Trojan," is a person from Troy, and any connection between perceived (or pop cultural) characteristics of Trojan

warriors as strong or persistent is too tenuous to "suggest" something about the characteristics of TROJAN® batteries. The case law in this circuit supports that conclusion. Most notably, in *Vesta Corp. v. Vesta Management Services, LLC*, 2016 WL 8710440, at *6 (S.D. Tex. Sept. 30, 2016), Judge Rosenthal concluded that "Vesta" was arbitrary for "property-management-and-rental services" even though Vesta "refers to the goddess of home and hearth." If the connection between the goddess of home and hearth and home rentals is too tenuous to make a mark suggestive, then so is the connection between a Trojan warrior and golf cart batteries. *See also Quantum Fitness Corp. v. Quantum LifeStyle Centers, L.L.C.*, 83 F. Supp. 2d 810, 819-20 (S.D. Tex. 1999) ("Quantum" mark is arbitrary and not suggestive for fitness equipment even though one dictionary definition is "an elemental unit of energy").[2]

42.     Even if the TROJAN® Marks were deemed suggestive, the Court would still conclude that they are very strong based on the commercial strength discussed

---

[2] Defendants claim that Mr. Pigott acknowledged that "Trojan" suggests endurance. But read in context, Mr. Pigott's testimony is better understood as saying that the TROJAN® **brand** rather than just the word Trojan, suggests endurance. ("Q: Do you agree that the word 'Trojan' describes or suggests qualities such as endurance? A: Trojan describes a lot of names **for us**. But quality is one of performance and history and US made. A lot of tenets to that. Q: Do you agree that one – that the word 'Trojan' by itself describes or suggests qualities such as endurance? A: Yeah. I would call endurance, performance in the same definition, yes. I would agree."). Mr. Pigott's testimony about what the **brand** conveys—based on Trojan Battery's longstanding and prominent use in the golf cart industry—is different from whether the **word** is suggestive. The Court concludes that Mr. Pigott's testimony is not evidence that consumers perceive "Trojan" as suggestive of a quality of batteries.

below. The conceptual difference between an arbitrary and suggestive mark is not

significant in this case, which is consistent with the law in this circuit and elsewhere:

> [F]or legal purposes, there is little, if any, reason to make the distinction [between arbitrary and suggestive marks], and the cases hardly ever bother to do so. 'Arbitrary' and 'suggestive' marks fall within the same legal pigeon hole of classification in that neither category requires proof of secondary meaning for legal protection and registration.

2 McCarthy on Trademarks & Unfair Competition § 11:12 (5th Ed.); *see also American*

*Rice*, 518 F.3d at 330-31 (market strength meant it was immaterial whether mark was

classified as descriptive or fanciful).

43.     The commercial strength of a mark—its market recognition and

reputation—is more important than conceptual strength in assessing the strength of a

mark. *Bd. of Regents of the Univ. of Houston Sys. v. Houston College of Law, Inc.*, 214 F.

Supp. 3d 573, 585 (S.D. Tex. 2016). The evidence demonstrates that the TROJAN®

brand has become very strong in the golf industry through decades of use, marketing to a

broad range of golf industry consumers, hundreds of millions in sales, a large market

share, and the well-known reputation of the TROJAN® brand in the golf cart market.

44.     Strong market recognition can be based on extensive advertising, length of

time in business, public recognition, and the quantity of sales of the branded products.

*Homax Prods., Inc. v. Homax, Inc.*, 2009 WL 7808951, at *6 (S.D. Tex. 2009); *Quantum*

*Fitness Corp. v. Quantum LifeStyle Centers, L.L.C.*, 83 F. Supp. 2d 810, 819-20 (S.D.

Tex. 1999).

45.     The TROJAN® trademark (both in registered and common law forms) is

strong in the golf cart market in part based on its extensive use for nearly 100 years..

46.     Additionally, the evidence shows that Trojan Battery has marketed TROJAN® batteries through numerous channels to its master distributors and ultimately to end consumers, such as at trade shows, through print literature and magazines, on its websites, and on social media, spending hundreds of thousands of dollars doing so. Much of this marketing is directed specifically at the golf cart market, such as Trojan Battery's yearly presence at the PGA tradeshow, where in 2022 Trojan Battery featured golf carts (containing its batteries and painted in its branding) from each of the "big three" manufacturers, Yamaha, Club Car, and EZ-GO..

47.     Trojan Battery also has products and product literature directed specifically to the golf cart market, such as this "Golf & Electric Vehicles" brochure that is made available to customers in print and on Trojan Battery's website:



48.     The evidence showed that golf cart dealers display these materials to show that they sell TROJAN® batteries for golf carts, such as B&W Golf Cars in Naples, Florida, which is an authorized dealer of TROJAN® batteries as well as Trojan-EV golf carts:



49.     The TROJAN® trademark is also extremely strong for golf cart batteries in light of the evidence that Trojan Battery sells hundreds of millions of dollars worth of TROJAN® golf cart batteries every year, amounting to millions of TROJAN® branded units going into the hands of retailers and end-users of golf cart batteries..

50.     Trojan Battery also markets its TROJAN® brand extensively, with hundreds of thousands of dollars per year in spending for a number of years, going up to over $1 million per year to support the launch of Trojan Battery's new lithium-ion golf battery. That marketing, aimed at increasing the visibility of the brand and reaching consumers and potential dealers of TROJAN® batteries, is evidence of the strength of the TROJAN® Marks.

51.     Finally, perhaps the best evidence of the strength of the TROJAN® brand for golf cart batteries is its commanding position in the marketplace. In the OEM market—the market for new golf carts rolling off assembly lines—TROJAN® batteries have upwards of 80% market share, due in large part to the fact that the three largest golf cart OEMs use TROJAN® lead acid batteries for all their requirements of those types of batteries. In the aftermarket for batteries, TROJAN® batteries command approximately 50% of the entire market for golf cart batteries.  This makes the TROJAN® brand ubiquitous in the golf cart space. *Kraft General Foods, Inc. v. Allied Old English, Inc.*, 831 F. Supp. 123, 129-30 (S.D.N.Y. 1993) ("Finally, the success of the Bull's-Eye product is evidenced by its annual sales of 45 million dollars and its commanding 9.5% market share of total barbecue sauce sales.").

52.     The evidence in this case of nearly 100 years of use, hundreds of millions in sales over just the last few years, a dominant position in the marketplace, and extensive marketing is far stronger even than cases that have found a high level of commercial strength. *See Homax Prods.*, 2009 WL 7808951, at *6-7 (use of mark for 27 years, large

market share, and gross sales of $82 million in one year made mark "strong" and "entitled to a higher level of protection").

53.     One factor in determining the strength of a mark in the marketplace is evidence that third parties use similar marks. Evidence of "'extensive' third-party use can weaken a mark and negate a likelihood of confusion." *Bd. of Supervisors for La. State Univ.*, 550 F.3d at 479 (quoting *Sun Banks of Florida, Inc. v. Sun Fed. Savings & Loan Assn.*, 651 F.2d 311 (5th Cir.1981) (over 4,400 businesses using 'Sun').

54.     Based on the evidence presented and discussed above, the Court concludes that the TROJAN® Marks, as well as common law marks for the word TROJAN® owned by Trojan Battery, as very strong marks in connection with golf cart batteries and are entitled to a wide scope of protection in the golf cart market. While Defendants' attempt to counter this evidence of commercial strength by arguing that third-party uses, such as on Trojan condoms and by the USC Trojans, have "sensitized the market" and made consumers less likely to be confused by competing uses of "Trojan," those arguments and evidence are unconvincing.

55.     "Extensive third-party usage may weaken a mark but does not in itself eliminate a mark's protectability in all cases." *Homax Prods., Inc. v. Homax, Inc.*, 2009 WL 7808951, at *7 (S.D. Tex. Aug. 5, 2009). Rather, "[t]hird-party usage may limit the scope of protection for a mark when the mark is used for purposes 'outside the uses to which plaintiff has already put its mark.'" *Id.*

56.     In assessing evidence of third-party use, the "key is whether the third-party use diminishes in the public's mind the association of the mark with the plaintiff." *Bd. of Supervisors for La. State Univ.*, 550 F.3d at 479.

57.     On the other hand, "[t]o the extent consumers are unaware of third-party use, the logic behind the third-party use rule is inapplicable; the consumers have not been conditioned to distinguish among the marks." *Bd. of Regents of the Univ. of Houston*, 214 F. Supp. 3d at 587.

58.     To the extent the finder of fact considers third-party usage of marks on dissimilar products and services from those involved in the case, those unrelated uses are entitled to less weight. *Homax Prods.*, 2009 WL 7808951, at *7 (less weight to third-party usage where only one example of a "business that possibly overlaps with that of Plaintiff"); *Quantum Fitness Corp. v. Quantum LifeStyle Centers, L.L.C.*, 83 F. Supp. 2d 810, 822 (S.D. Tex. 1999) ("Quantum LifeStyle has not provided persuasive evidence of third-party usage of the word 'quantum' in marks or names used in the fitness and exercise industry.").

59.     Third-party trademark registrations or filings in the U.S. Patent and Trademark Office are not evidence of use in the marketplace because courts "will not assume knowledge on the part of the purchasing public by mere registrations in the Patent Office, nor will we assume that the marks are in continuing use, so as to have any effect on the mind of the purchasing public merely because they have been so registered." *Turner v. HMH Publication Co.*, 380 F.2d 224, 228 n.2 (5th Cir. 1967); *see also Lucky's Detroit, LLC v. Double L, Inc.*, 533 Fed. Appx. 553, 557 (6th Cir. 2013) ("We have

recognized, however, that 'merely showing the existence of marks in the records of the [USPTO] will not materially affect the distinctiveness of another's mark which is actively used in commerce."); *Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee en 1772*, 396 F.3d 1369, 1373 (Fed. Cir. 2005) ("The probative value of trademarks depends entirely upon their usage."); *Gold Kist Inc. v. ConAgra, Inc.*, 708 F. Supp. 1291, 1298 (N.D. Ga. 1989) ("It is well-established that ConAgra must introduce more than mere copies of registrations or pending applications. Instead, ConAgra must introduce evidence which clearly establishes that these alleged third-party marks are in fact in use." (citing *Turner v. HMH Pub.*, 380 F.2d at 228)).

60.     The Court concludes that none of the evidence of third-party trademarks presented in this case weakens the TROJAN® Marks in the golf cart space. As to Trojan condoms and the University of Southern California Trojans, there is no question that those uses are far afield from golf carts and golf cart batteries. *See Quantum Fitness*, 83 F. Supp. 2d at 822 (evidence of third-party use outside the fitness industry did not preclude likelihood of confusion); *Homax Products*, 2009 WL 7808951, at *7 (summary judgment granted where defendant did not supply sufficient evidence to show claimed third-party business registrations were in use in a similar business to plaintiff, and therefore mark was "sufficiently strong in the home improvement market to create a likelihood of confusion"). While Defendants argue that these are "heavyweight" uses, there is simply no evidence that any consumer views Trojan condoms or Trojan for a university mascot as reducing the distinctiveness of the TROJAN® brand in the golf industry or for golf cart batteries. Indeed, multiple witnesses, including third-party

witnesses, testified that they never perceived any connection between Trojan Battery and Trojan condoms or USC. In any event, two uses of Trojan in unrelated markets falls far short of the "extensive" use required to weaken a mark, given the strong evidence of commercial strength for the TROJAN® brand in the golf cart industry. *Bd. of Supervisors for La. State Univ.*, 550 F.3d at 479 (evidence of third-party use by 31 third-parties "falls far below that of extensive use").

61.     As to other third-party uses, Defendants attempted to introduce DTX-14, which appears to include printouts from the online records of the U.S. Patent and Trademark Office that were downloaded by one of Defendants' lawyers. There was no evidence that any of these marks are in use, and no evidence that any of the marks are used in the same field as the parties here—the golf cart market. Therefore, even if these documents are admissible, they do not supply any evidence that the marks have had "any effect on mind of the purchasing public." *Turner*, 380 F.2d at 228 n.2; *Bd. of Supervisors for La. State Univ.*, 550 F.3d at 479 (In assessing evidence of third-party use, the "key is whether the third-party use diminishes in the public's mind the association of the mark with the plaintiff.").[3]

62.     Moreover, it is settled law that the existence of the records themselves does not provide *prima facie* evidence under 15 U.S.C. § 1057(b) of the facts contained in the printout, which is a presumption afforded only to the registrant of the mark and not to a

---

[3] Notably, the only USPTO printouts in DTX 14 that refer to "batteries" are owned by Trojan Battery. One printout lists "battery chargers," but the record reflects that it was abandoned and never issued as a trademark registration.

third party. First, Defendants have not attempted to introduce actual "certificates of registration," and therefore the statute does not apply. Second, as mentioned, only the registrant may invoke Section 1057(b)'s presumptions: "While a trademark registration owned by one of the *parties* in a trademark lawsuit may be prima facie evidence of the facts contained therein, the introduction of a trademark registration of a non-party to a lawsuit does not provide evidence of any of the recorded information, including date of first use." *Nike, Inc. v. Nikepal Int'l, Inc.*, 2007 WL 2782030, at *7 n.8 (E.D. Cal. Sept. 18, 2007); *see also* 2 McCarthy on Trademarks and Unfair Competition § 11.89 ("Thus, a party in the position of defendant (either in court or before the T.T.A.B.) cannot invoke the presumption that a mark is in use for the third party registrations that defendant cites to argue that plaintiff's mark is weak."); *Hollister, Inc. v. Downey*, 656 F.2d 1208, 1210 (C.C.P.A. 1977) ("To be entitled to that statutory presumption of ownership, Hollister must show that it is the registrant, i.e., the owner of the pleaded registrations.").

63.     The case law cited above follows the text of the Lanham Act. 15 U.S.C. § 1115(a) which addresses the "evidentiary value" of trademark registrations and provides that certain presumptions are afforded in litigation only to a registration "owned by a party to an action."

64.     Finally, the evidentiary significance of the printout evidence in DTX-14 is further reduced by the fact that the vast majority of the documents indicate on their face that the registration or application relied upon is dead, either because it has expired, been cancelled, or was abandoned.

65.     Accordingly, the Court concludes that Defendants have not shown evidence of third-party use that would have the effect of weakening the distinctiveness of Plaintiff's TROJAN® Marks.

66.     In sum, the evidence here is demonstrates that the TROJAN® Marks are strong marks for golf cart batteries and in the golf industry and entitled to a wide scope of protection, and therefore this factor weighs in favor of a likelihood of confusion.

**Digit 2: Similarity of the Marks**

67.     The similarity of the marks is determined by comparing the marks' appearance, sound, and meaning. *Bd. of Supervisors for La. State Univ.*, 550 F.3d at 479.

68.     "Similarity of appearance is determined on the basis of the total effect of the designation, rather than on a comparison of individual features, but courts should give more attention to the dominant features of a mark." *Alliance for Good Gov't. v. Coalition for Better Gov't.*, 901 F.3d 498, 510-11 (5th Cir. 2018).

69.     Even if prospective purchasers recognize that the two designations are distinct, confusion may result if purchasers are likely to assume that the similarities in the designations indicate a connection between the two users. *Elvis Presley Enterprises, Inc. v. Capece*, 141 F.3d 188, 201 (5th Cir. 1998).

70.     The question is whether, under the circumstances of use, the marks are sufficiently similar that prospective purchasers are likely to believe that the two users are somehow associated. *Alliance for Good Gov't*, 901 F.3d at 511.

71.     The Court finds that the dominant element of both parties' marks is the word TROJAN and that it is therefore the most important feature for the likelihood of

confusion analysis. *Viacom Int'l*, 891 F.3d at 193; *see also Alliance for Good Government*, 901 F.3d at 510 (courts "give more attention to the dominant features of the mark"). The analysis focuses on "Trojan" because the "additional words in each mark are more generic"—namely "Battery Company" or "Battery Sales" (for the Trojan Battery registrations in JTX 2 and JTX 3) and "EV" for Trojan EV. *Streamline Production Sys. , Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 454 (5th Cir. 2017). "EV," as used by Trojan EV and Golf Carts of Cypress, just refers to "electric vehicle," a generic term.

72.     Trojan is the dominant word in both party's marks because the evidence at trial demonstrated that that is how consumers refer to the products. This usage is consistent with Mr. Pigott's testimony that the word TROJAN is the most important part of Trojan Battery's brand identity. The Court concludes that the identical dominant element in the parties' respective marks strongly favors a finding of likelihood of confusion.

73.     The appearance of the parties' logos further supports a finding of likelihood of confusion. The evidence shows that Trojan Battery has consistently used the word TROJAN to refer to its brand, and that the other aspects of its brand identity, such as the winged Pegasus horse and the maroon color on both its batteries and marketing, identify Plaintiff's batteries as TROJAN® batteries. Although Defendants use some different imagery, it is also Greek imagery that reinforces the common word TROJAN. *See Viacom Int'l v. IJR Capital Investments, L.L.C.*, 891 F.3d 178, 193 (5th Cir. 2018) ("Logos for the two marks may differ, but the words themselves are indistinguishable and would likely confuse consumers as to the source, affiliation or sponsorship of IJR's The

Krusty Krab restaurant."); *Vesta Corp.*, 2016 WL 8710440, at *7 n.3 (ownership of word mark meant that focus on use of identical word was appropriate and weighed "strongly in favor of finding a likelihood of confusion").

74.    Moreover, the parties' marks sound highly similar, because they consist of the word TROJAN, while also sometimes (and sometimes not) followed by the descriptive term "battery" or "EV" (which stands for "electric vehicle"). That is consistent with the evidence that consumers who encounter TROJAN® batteries often do so at retail stores or in places where they will hear the name orally as just "Trojan" or "Trojans."

75.    Accordingly, the Court concludes that the parties' respective marks are highly similar and that this factor weighs in favor of a likelihood of confusion.

## Digit 3: Similarity of the Parties' Respective Goods and Services

76.    "The greater the similarity between the products and services, the greater the likelihood of confusion." *Exxon Corp. v. Texas Motor Exchange of Houston, Inc.*, 628 F.2d 500, 505 (5th Cir. 1980). This factor focuses not on whether the qualities of the goods are similar, such as price, appearance, or function, but on whether they are "related in some manner, or that the circumstances surrounding their marketing are such, that they would be likely to be encountered by the same persons in situations that would give rise, because of the marks used thereon, to a mistaken belief that they originate from or are in some way associated with the same source or that there is an association or connection between the sources of the respective goods or services." *Bd. of Regents, Univ. of Texas*

*Sys. v. KST Electric, Ltd.*, 550 F. Supp. 2d 657, 670 (W.D. Tex. 2008) (quoting *In re Opus One, Inc.*, 60 U.S.P.Q.2d 1812 (T.T.A.B. 2001)).

77.     "When products or services are noncompeting, the confusion at issue is one of sponsorship, affiliation, or connection." *Elvis Presley Enterprises, Inc. v. Capece*, 141 F.3d 188, 202 (5th Cir. 1998). One type of relationship between products that is relevant to likelihood of confusion is "when the sponsor or maker of one business or product might naturally be assumed to be the maker or sponsor of another business product." *Elvis Presley Enterprises*, 141 F.3d at 202.

78.     In assessing such a relationship, the question is whether the "junior user's services are in a market that is one into which the senior user would naturally expand." *Elvis Presley Enterprises*, 141 F.3d at 202. "The actual intent of the senior user to expand is not particularly probative of whether the junior user's market is one into which the senior user would naturally expand." *Id.* "If consumers believe, even though falsely, that the natural tendency of producers of the type of goods marketed by the prior user is to expand into the market for the type of goods marketed by the subsequent user, confusion may be likely." *Id.*

79.     Another relevant relationship between products is whether the products are complementary. Complementary products are particularly susceptible to confusion. *Fuji Photo Film Co. v. Shinohara Shoji Kabushiki* Kaisha, 754 F.2d 591, 598 (5th Cir. 1985) (finding defendant's offset printing presses and plaintiff's photographic materials used in the offset printing process to be complementary and thus closely related).

80.     Complementary products are products that are often used or sold together. *Fuji Photo Film*, 754 F.2d at 598 (citing *In re Martin's Famous Pastry Shoppe, Inc.*, 748 F.2d 1565, 1567 (Fed. Cir. 1984) ("In the instant case, we take notice that the products 'bread' and 'cheese' are often used in combination. Such complementary use has long been recognized as a relevant consideration in determining a likelihood of confusion.")).

81.     The products at issue here—electric golf carts and golf cart batteries—are highly related. First, the evidence shows that companies, including one specific company called Star EV, already use the same brand to sell golf carts and golf cart batteries.. So consumers are likely to think that both sorts of products are sold by the same company, and therefore the name Trojan on both golf carts and golf cart batteries is likely to lead a consumer to assume that there is a connection. Consistent with *Elvis Presley Enters.*, it is not relevant that Trojan Battery itself may not have plans to enter the golf cart market; what is relevant is that consumers expect that they may well see the same brand on golf carts and golf cart batteries.

82.     Second, the products are highly complementary. An electric golf cart like Trojan-EV cannot operate without batteries of the type sold by Trojan Battery under the TROJAN® brand. And there was extensive and unrebutted testimony that golf cart batteries are crucial to the performance and consumer experience of a golf cart. Indeed, customer reviews indicate that customers believe the good or bad performance of a battery reflects on the reputation of the golf cart. Under *Fuji Photo*, the Court finds that

golf cart batteries and golf carts are the sort of complementary products that are "particularly susceptible to confusion."[4] *Fuji Photo*, 754 F.2d at 598.

83.     Put simply electric golf carts like Trojan-EV and golf cart batteries like TROJAN® are always used together and are often sold together. For example, the "big three" golf cart manufacturers, Yamaha, Club Car, and EZ-GO, ship their golf carts with TROJAN® batteries in them.

84.     In so finding, the Court rejects Defendants' argument that the presence of Trojan Battery's registrations in a different administrative class (class 9) than the applications filed by Defendant Trojan EV for "motorized golf carts" (class 12) is relevant to the relatedness of the products. The Lanham Act is clear that the classification system is "for convenience of Patent and Trademark Office administration, but not to limit or extend the applicant's or registrant's rights." 15 U.S.C. § 1112; *see also In re Detroit Athletic Co.*, 903 F.3d 1297, 1307 (Fed. Cir. 2018) ("Thus, that the goods and services at issue fall within different classes does not preclude a finding that they are

---

[4] Defendants argue that in order to be "complementary," products must meet a test of "reciprocal uselessness," i.e., each product is "useless" without the other. The Court disagrees. Defendants' argument ignores the ordinary meaning of "complementary products" as products that are often sold together. Indeed, *Fuji Photo*, on which Defendants rely, cited examples of common complementary products that meet this ordinary definition, such as bread and cheese or pancake mix and pancake syrup. *See Fuji Photo*, 754 F.2d at 598. And in any event, Defendants' electric golf carts *are* useless without batteries, and certain TROJAN® batteries are designed specifically for golf carts (and thus are useless without them). That is precisely the circumstance in *Fuji Photo*. *See id.* ("Shinohara's presses are useless without equipment and materials of the sort made by Fuji (among others); *some of* Fuji's products are useless without an offset press like Shinohara's." (emphasis added)).

similar."); *Savage Tavern, Inc. v. Signature Stag, LLC*, 589 F. Supp. 3d 624, 651 (N.D.

Tex. 2022) ("[T]he fact that the goods or services fall in different parts of the USPTO

classification system is totally irrelevant to the issue of likelihood of confusion." (quoting

McCarthy on Trademarks & Unfair Competition § 24:6)).

85.     Additionally, the evidence—namely Defendants' DTX 15—demonstrates

why classification has no bearing on likelihood of confusion. The same classes can

contain vastly different products. *See* DTX 15, at TROJAN EV001987-97 (class 12

explanatory note, which contains golf carts, also includes "windshield wipers,"

"wheelbarrows," "paddles for canoes," "helicams," "funnels for ships," and "aircraft").

86.     Accordingly, the Court concludes that golf cart batteries and golf carts are

highly related products, and that this factor weighs heavily in favor of a likelihood of

confusion.

**Digit 4: Overlap in Retail Outlets and Purchasers**

87.     Where the parties' respective products are sold in similar channels of trade,

in similar retail locations, and to similar purchasers, there is a greater likelihood of

confusion. *Am. Rice*, 518 F.3d 321, 332 (5th Cir. 2008).

88.     This factor weighs in favor a likelihood of confusion because both parties

sell their products primarily in golf cart retail stores to similar purchasers: people who

own or use golf carts.

89.     It is undisputed that, despite the small network of dealers for Trojan EV, at

least five dealers already sell both TROJAN® batteries and Trojan-EV golf carts: Indian

River Golf Carts, B&W Golf Cars, BMK Golf Carts, Mid-America Customs, and Back9 Golf Carts.

90.    In fact, the largest customers for Trojan EV other than Golf Carts of Cypress are all TROJAN® battery dealers.

91.    The Court therefore finds this digit to weigh heavily in favor of a likelihood of confusion. It is particularly significant that the parties already have overlapping retailers in light of the relatively young and limited nature of Trojan EV's business. It is highly likely that that overlap will only grow in the future given that both parties seek to sell through similar outlets: golf cart retailers.

**Digit 5: Overlap in Advertising Media**

92.    "[T]he greater the degree of overlap in the marketing approaches of the two entities, the greater the likelihood of confusion." *Quantum Fitness Corp. v. Quantum LifeStyle Centers, L.L.C.*, 83 F. Supp. 2d 810, 827 (S.D. Tex. 1999).

93.    Under this digit of confusion, overlap in advertising channels is significant regardless of whether the plaintiff or the defendant advertised in a given medium first. "[T]his digit of confusion focuses on the similarity of the advertising without regard for which advertising came first." *Streamline Prod. Sys.*, 851 F.3d at 455.

94.    There is no dispute here that the parties advertise in the same media, specifically on their websites, on social media, and in the same print and online publications. *See Viacom Int'l v. IJR Capital Investments, LLC*, 891 F.3d 178, 195 (5th Cir. 2018) ("This court has held that when '[b]oth companies use print advertisements, direct mailings, and internet promotion' it 'supports an inference that the parties use

71

similar advertising and marketing channels.'"). Several exhibits show TROJAN® battery advertisements appearing in the same publications as Trojan-EV advertisements, such as Golf Car Options and Golf Carting Magazine:





95.     Defendants argue that Trojan Battery only began advertising in Golf Car Options and Golf Carting magazine after Defendants did so. But "this digit of confusion focuses on the similarity of the advertising without regard for which advertising came first." *Streamline Prod. Sys.*, 851 F.3d at 455.

96.     Moreover, there is no evidence that Trojan Battery's advertisements in Golf Carting or Golf Car Options were done solely for the purpose of this litigation. To the contrary, the evidence was that they were in line with Trojan Battery's history of advertising in publications directed to the golf industry. Ms. Brennand, for example, explained that Trojan Battery's advertisements in Golf Carting Magazine and Golf Car Options are consistent with the company's focus on "our target market of both our

dealers and also the end consumer in some cases.". Ms. Brennand also explained that, even if the advertisements in Golf Carting and Golf Car options were more recent, that Trojan Battery "has been advertising in golf magazines" for "as long as I could find digital files." *Id.* at 50:13-18.

97.      Trojan Battery and both Defendants also promote their brands through Instagram and other social media directed at retail dealers and ultimately end-users of their respective products. Those target audiences overlap almost entirely—users of golf carts. The similarity in advertising channels is reinforced by the similar manner in which Trojan Battery and Trojan EV sell their products—through authorized dealers, and primarily golf cart retailers.

98.      In light of the overlap in advertising media and the types of advertising campaigns, the Court finds this digit weighs heavily in favor of a likelihood of confusion.

**Digit 6: Defendants' Intent**

99.      Good faith is not a defense to trademark infringement. *Fuji Photo Film Co. v. Shinohara* Shoji *Kabushiki Kaisha*, 754 F.2d 591, 596 (5th Cir. 1985). If a trademark infringement defendant infringed in good faith, that fact is immaterial to the likelihood of confusion analysis. *Id.* at 596-97. "The reason for this is clear: if potential purchasers are confused, no amount of good faith can make them less so." *Id.* at 596; *see also Viacom Int'l*, 891 F.3d at 195 ("If there is no evidence of intent to confuse, then this factor is neutral."); *Elvis Presley Enters.*, 141 F.3d at 203 ("If the defendant acted in good faith, then this digit of confusion becomes a nonfactor in the likelihood-of-confusion analysis, rather than weighing in favor of a likelihood of confusion.").

100.    However, a defendant's intent to benefit from the reputation of the plaintiff's products is compelling evidence of likelihood of confusion. *Am. Rice*, 518 F.3d at 332. Indeed, "[b]ad faith . . . may, without more, prove infringement." *Fuji Photo Film*, 754 F.2d at 596. Thus, "[i]f a mark was adopted with the intent to confuse the public, that alone may be sufficient to justify an inference of a likelihood of confusion." *Elvis Presley Enters.*, 141 F.3d at 203.

101.    Even if the defendant's mark was not adopted with intent to confuse, that does not "immunize an intent to confuse in the actual use of the mark." *Elvis Presley Enters.*, 141 F.3d at 203. Thus, the Fifth Circuit has held that subsequent activities by a defendant can "evidence[] an intent to trade on" the plaintiff's reputation. *Westchester Media v. PRL USA Holdings, Inc.*, 214 F. 3d 658, 666 (5th Cir. 2000).

102.    The evidence here demonstrates that Trojan EV and Golf Carts of Cypress intended to trade on the goodwill of the TROJAN® brand. First, Trojan EV and Golf Carts of Cypress argue that they first became aware of TROJAN® golf cart batteries in November 2020. But even if that is true, it still means that the Defendants knew of the TROJAN® brand before they began selling golf carts in the United States in January 2021. Defendants were well aware of the close connection between TROJAN® batteries and electric golf carts. The Court concludes that their infringement was therefore willful.

103.    Additionally, the Court concludes that Mr. Nell's testimony that he did not know about TROJAN® batteries or Trojan Battery Company when he adopted the Trojan-EV name is not credible. Mr. Nell began selling golf carts in February 2019 and organized Golf Carts of Cypress in August 2019 to sell used Club Car, Yamaha, and EZ-

GO golf carts—three types that use TROJAN® batteries exclusively for their lead acid requirements. Golf Carts of Cypress had a service department that it touted on its website as having "certified technicians" who could perform "routine services" such as "replacement batteries." Given the dominant market share of TROJAN® batteries and their use by Yamaha, Club Car, and EZ-GO, it is highly unlikely that Mr. Nell was unaware of TROJAN® batteries for the 21 months between February 2019 and November 2020.

104.    Circumstantial evidence demonstrating the ubiquity of TROJAN® batteries in golf cart retail stores supports this conclusion. In addition, Rick Sanders, a National Account Manager for Trojan Battery, testified that, in thousands of visits to golf cart retailers he "can't recall ever hearing" of a dealer who had not heard of TROJAN® batteries. Mr. Sanders's testimony was consistent with the testimony of Mackenzie Johnston, whose business (East Central Sports) is not a Trojan Battery dealer and does not stock any golf cart batteries, but who knew of the TROJAN® brand as a "well-known battery name for golf carts.

105.    Also informing the Court's conclusion is that the November 2020 date appears to have little basis other than for Defendants to argue that they adopted the mark in good faith. Mr. Nell organized Trojan-EV on October 21, 2020, DTX 2, and communicated the name Trojan-EV to Green Motor Technology—the first manufacturer of Trojan-EV golf carts—on October 22, 2020. Mr. Nell claims that his first knowledge of TROJAN® batteries came from seeing an email from a Continental Battery Systems employee dated November 19, 2020 offering to sell TROJAN® T875 golf cart batteries

to Golf Carts of Cypress. But the email itself does not reflect a lack of knowledge of TROJAN® batteries on the part of Golf Carts of Cypress or Mr. Nell. Just one day after receiving the price quote, Mr. Nell's manager, Jose Fuentes, responded "[c]an you do 90 for the trojans and 25 on the cores." That response strongly suggests that Mr. Nell and Mr. Fuentes were familiar enough with TROJAN® batteries to want to purchase them at a higher price than any of the other batteries offered, not that they were only just hearing about them for the first time. *Id.* The timing of Mr. Nell's "awareness" of TROJAN® batteries—21 months after he first got into the golf cart business but less than 1 month after he picked Trojan-EV for his golf carts—is highly coincidental unless, as the Court concludes, it was invented for the purpose of using it as a defense in this case.

106.    Further suggesting that Mr. Nell was aware of TROJAN® batteries before November 2020 is his acknowledgement that the Golf Carts of Cypress service center website had pictures of battery compartments that included TROJAN® batteries (identifiable by their maroon casing).  DTX 228. Mr. Nell testified that this website was up by late 2019 or early 2020, and has remained the same since its inception. Mr. Nell's explanation for this apparent discrepancy was that he "did not design that website," that the designer used a "stock photograph," and that Mr. Nell himself is colorblind and so could not see the maroon color. Regardless of the truth of those statements, the presence of TROJAN® batteries on the Golf Carts of Cypress website demonstrates how widespread TROJAN® batteries are in the industry and further undermines Mr. Nell's claim that he was unaware of TROJAN® batteries when he organized Trojan EV on October 21, 2020.

77

107.    Finally, the evidence demonstrated that Golf Carts of Cypress had in fact promoted golf carts containing TROJAN® batteries on its website before it ever sold Trojan-EV golf carts. PTX 262, 263. Those listings referred to "Trojan" batteries in Club Car and EZ-GO golf carts. While none of the above facts is conclusive by itself, they support the strong inference that  Mr. Nell was not being truthful in testifying that he did not know of TROJAN® batteries at the time he organized Trojan EV on October 21, 2020. The Court finds this lack of truthfulness to be strong evidence of intent to deceive and intent to trade on the TROJAN® name.

108.    Further supporting the conclusion that Defendants' infringement is willful is that Defendants continued to infringe, and indeed developed an entirely new infringing golf cart *after* receiving a cease and desist letter and *after* being sued in this litigation. While Defendants argue that they were entitled to dispute Trojan Battery's claims of infringement, they did so at their peril. *See Elvis Presley Enters.*, 141 F.3d at 205 ("Any acts after receiving a cease and desist letter are at the defendant's own risk because it is on notice of the plaintiff's objection to such acts."); *S&H Indus., Inc. v. Selander*, 932 F. Supp. 2d 754, 767 (N.D. Tex. 2013) (finding case "exceptional" for attorney's fees purposes where defendant "continued to engage in unauthorized use of the Mark after Plaintiff filed suit against him and even up to the point at which Plaintiff moved for summary judgment").

109.    Trojan EV has also continued to use the Trojan EV name on golf carts despite knowing—based on messages received through its "Become a Dealer" link on its website—that potential consumers were actually confused about the relationship between

Trojan EV and Trojan Battery. As explained *infra*, paragraphs 119, 122, Trojan EV received at least seven messages mentioning Trojan Battery. This evidence weighs heavily in favor of a finding that Trojan EV intended to trade on the goodwill in the TROJAN® brand. *See Vital Pharmaceuticals v. PHD Marketing, Inc.*, 2022 WL 2952495, at *3-4 (C.D. Cal. July 26, 2022) (defendant's continued use of the infringing mark after instances of consumer conclusion that "included emails received by Defendant directly" reflected improper intent).

110.    The Court further concludes that Trojan EV's decision to invest in making the Trojan-EV-X model after receiving a cease and desist letter and being sued in this case is strong evidence of intent to deceive. Mr. Nell testified that, after receiving the cease-and-desist letter, he received word from his manufacturer that another company had been offered an exclusive deal with respect to the model of golf cart that Trojan EV had been purchasing. At that point, Mr. Nell could have stopped selling Trojan EV golf carts altogether, or built a new model using one of his existing brands (EV Titan or Spartan EV). Instead, Mr. Nell doubled-down on the Trojan-EV name, investing what he claims was approximately $1.5 million of his own money to create molds for the Trojan-EV-X that included the name Trojan-EV on almost every piece. *See e.g. Vital Pharms*, 2022 WL 2952495 ("Defendant's continued sales despite its knowledge of consumer confusion with Plaintiffs' nearly identical marks is indicative of an improper motive

111.    Accordingly, the Court concludes that Defendants intended to trade on the goodwill build up in Plaintiff's TROJAN® brand, and that this factor weighs in favor of a finding of likelihood of confusion.

**Digit 7: Actual Confusion**

112.    Although it is not necessary for a finding of likelihood of confusion, actual confusion is the best evidence of likelihood of confusion. *Elvis Presley Enterprises, Inc. v. Capece*, 141 F.3d 188, 203 (5th Cir. 1998); *Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 597 (5th Cir. 1985); *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 489 (5th Cir. 1971) (actual confusion evidence warranted directed verdict). Very little proof of actual confusion is necessary to prove the likelihood of confusion. *Id.* On the other hand, when actual confusion is shown, "the defendant must provide 'an almost overwhelming amount of proof . . . to refute such proof.'" *Streamline Production Sys.*, 851 F.3d at 457.

113.    Evidence of confusion in retail dealers can provide evidence that end consumers are likely to be confused. *See Fuji Photo*, 754 F.2d at 597; *World Carpets*, 438 F.2d at 489 (calls from confused retailers supported "clear inference" of actual confusion); *Vesta Mgmt*, 2016 WL 8710440, at *11 ("Evidence of confusion in others permits the inference of confusion in purchasers.").

114.    Initial-interest confusion is relevant evidence of actual confusion, even if no sale is actually completed and even if the confusion is later dissipated by further inspection of the goods, services, or premises. *Elvis Presley Enterprises*, 141 F.3d at 201.

115.    A plaintiff may show actual confusion using anecdotal instances of consumer confusion, systematic consumer surveys, or both. *Streamline Prods. Sys.*, 851 F.3d at 457. Survey evidence is not required, and no negative inference is drawn from a plaintiff or defendant's decision not to conduct a survey. *See Midwestern Pet Foods, Inc.*

*v. Societe des Produits Nestle S.A.*, 685 F.3d 1046, 1054 (Fed. Cir. 2012) ("Although Nestle did not introduce consumer survey evidence in support of its showing of a likelihood of confusion, neither the Board nor this court has required survey evidence in order to show a likelihood of confusion."); *Tools USA & Equip. Co. v. Champ Frame Straightening Equip. Inc.*, 87 F.3d 654, 661 (4th Cir. 1996) ("Actual confusion can be demonstrated by survey evidence, but contrary to Champ's suggestion, survey evidence is not necessarily the best evidence of actual confusion and 'surveys are not required to prove likelihood of confusion.'"); *RooR Int'l B.V. v. Stinky's Smoke Shop, LLC*, 2020 WL 7646742, at *3 (E.D. Tex. Dec. 23, 2020) ("[S]urvey evidence is not required in order to show a likelihood of confusion.").

116.    Defendants criticize Trojan Battery's decision not to do a survey in this case, but consistent with the law cited above, the Court does not draw any negative inference from that decision. In addition, it appears to have been a reasonable decision given that Trojan EV came to Trojan Battery's attention through an instance of actual confusion—Mr. Malloy's email to Rick Sanders. In any event, given the anecdotal evidence of actual confusion and that other digits also weigh in favor of a likelihood of confusion, there is no need for survey evidence to bolster that conclusion.

117.    Here, the Court concludes that Trojan Battery has demonstrated evidence of actual confusion and that this factor therefore weighs heavily in favor of a finding of likelihood of confusion.

118.    First, the testimony of Bill Malloy establishes that he was initially confused into thinking that Trojan EV was affiliated with Trojan Battery based on the use of the

common name "Trojan." While Mr. Malloy's initial confusion was ultimately dispelled by his further inspection of the Trojan-EV website, this actual confusion by a retailer of golf carts—presumably a more sophisticated participant in the golf cart market than an ordinary end user of a golf cart—is compelling evidence of the likelihood of confusion. *Vesta Corp.*, 2016 WL 8710440, at *12 ("The fact that vendors and others have been confused shows that even more knowledgeable industry players are misled . . . ."). The Fifth Circuit has found, in similar circumstances, that potential patrons who "initially thought" the defendant's bar was associated with the Plaintiff was strong evidence of actual confusion even though all the witnesses "testified that, upon entering and looking around the bar, they had no doubt that [plaintiff] was not affiliated with it in any way." *Elvis Presley Enters.*, 141 F.3d at 204.

119. The Fifth Circuit's concern that initial interest confusion may benefit the defendant because "[o]nce in the door, the confusion has succeeded because some patrons may stay, despite realizing that the bar has no relationship" with plaintiff is equally compelling here. *Elvis Presley Enters.*, 141 F.3d at 204. The evidence demonstrates that Mr. Malloy in fact did "stay, despite realizing that the [defendant] has no relationship" with Trojan Battery, and filled out forms to become a Trojan-EV dealer. B. Malloy Dep. Designations, at 12:24-13:07, 15:21-16:24. Nashville Powersports only aborted that opportunity when Trojan EV sent it a confidential price list and Nashville Powersports determined that Trojan EV's carts were "[t]oo expensive, margins are too small." Mr. Malloy's confusion is thus powerful evidence of the potential likelihood of confusion here. B. Malloy Dep. Designations, at 17:12-23.

120.    There is also evidence that potential retailers or consumers sent messages indicating confusion through Trojan EV's "Become a Dealer" or "Contact Us" forms, including the following messages:

a.  "I would like to become a dealer for your company. We are a Trojan Battery Dealer, and I know they have a great product.";

b.  "I own a few restaurants but have been involved in golf carts my whole life growing up in Peachtree city. I have purchased numerous sets of Trojan batteries over the years.";

c.  "We are a booming golf cart repair shop here in Green Valley, we also often refurbish golf carts with various levels of customization at their disposal, from custom upholstery to pain jobs, and accessories; we'd like to expand the choice of customizing their new cart with your batteries! we have had multiple customers ask for your company specifically, we look forward to receiving more information.";

d.  "I would appreciate it if you could source this product with a pricing quote for the following product below: *12V 250-300Ah AGM or Lithium Batteries."

121.    These examples of actual confusion are further compelling evidence of likelihood of confusion. *See World Carpets*, 438 F.2d at 489 (calls from confused retailers supported "clear inference" of actual confusion); *Vesta Mgmt*, 2016 WL

8710440, at *11 ("Evidence of confusion in others permits the inference of confusion in purchasers.").

122. Additionally, the context of these messages demonstrates that this confusion was "caused by the trademarks employed," and that it "swayed consumer purchases" even if consumers did not actually have the opportunity to complete a purchase. *Streamline Production Sys.*, 851 F.3d at 457; *see also id.* ("[W]e have never required a showing of lost profit to accompany instances of actual confusion."); *Elvis Presley Enters.*, 141 F.3d at 204 (no actual sale needs to be completed). Mr. Nell testified that each potential customer who sent the messages would have had to go onto the Trojan EV website (thus seeing the Trojan EV marks) and click on "Become a Dealer" (evidencing their intent to enter a business relationship with Trojan EV. ("[This email] came to Trojan EV because somebody went on the Trojan EV website and clicked 'become a dealer', right? A: Sure. Q: Sure or yes? A: Yes."). As noted above, it is not necessary that sales actually occur; Mr. Nell candidly testified that Trojan EV would have signed up each sender as a Trojan EV dealer if it was "interested" in doing so, and would otherwise ignore the message.

123. Several other individuals have written in through Trojan EV's website and mentioned Trojan Battery, further evidence that consumers perceive Trojan EV as closely related to Trojan Battery, if not one and the same. At least one of those who wrote in became a Trojan EV dealer.

124. The evidence of actual confusion is compelling in this case, and is all the more compelling given the limited time Defendants have been selling Trojan EV golf

carts and the limited reach of their sales efforts. The evidence of actual confusion weighs heavily in favor of a finding of likely confusion.

**Digit 8: Sophistication of Purchasers**

125.    As a general matter, confusion is less likely where "items are expensive and the buyers are sophisticated." *Board of Regents of the Univ. of Houston*, 214 F. Supp. 3d at 598 (S.D. Tex. 2016) (same advertising channels "weighs heavily in favor of confusion").  However, "a high price tag alone does not negate other indicia of likelihood of confusion," and "even a sophisticated purchaser can be subject to initial interest confusion." *Id.*

126.    Defendants focus on the sophistication of Trojan Battery's OEM and master distributor customers, but the Court finds that that is not the correct focus in this case. Neither the OEMs nor the master distributors are likely to be purchasers of the Defendants' Trojan-EV golf carts, and therefore are not the focus of the confusion analysis. The Lanham Act focuses on whether the defendant's use of the infringing mark is likely to cause confusion, and thus it is Defendants' customers that should be the focus. *See* 15 U.S.C. 1114(1) (focusing on whether defendant's "use is likely to cause confusion").

127.    Moreover, since Defendants do not sell to OEMs or master distributors, it is proper to focus on the overlapping consumers of both Trojan Battery and Defendants. Those customers are retail dealers of golf carts (consumers of both TROJAN® batteries and Trojan-EV) and end-users of golf carts (consumers of TROJAN® batteries, Trojan-EV, and Golf Carts of Cypress).

128.    The evidence in this case does not show that these consumers are particularly sophisticated in any way that would assist them in distinguishing between such closely related trademarks in such closely related fields. For example, the evidence shows that retail store purchasers of Defendants' Trojan-EV golf carts have already been confused. Bill Malloy of Nashville Powersports testified that he was initially confused into believing that Trojan EV was affiliated with Trojan Battery. And Trojan EV received several communications through its website evidencing confusion by companies or individuals who clicked on Trojan EV's "Become a Dealer" link.. Accordingly, the evidence does not support the conclusion that golf cart retailer sophistication will reduce the likelihood of confusion between TROJAN® batteries and Trojan-EV golf carts. *See Vesta Corp. v. Vesta Management Servs. LLC*, 2016 WL 8710440, at *12 (S.D. Tex. Sept. 30, 2016) ("The fact that vendors and others have been confused shows that even more knowledgeable industry players are misled by Vesta Management's use of the 'Vesta' word mark.").

129.    As to end users of golf carts, the evidence shows that the virtually all of Golf Carts of Cypress's sales of golf carts are to individual consumers. There was no evidence at trial that these purchasers are particularly knowledgeable about brands in the golf industry or would have any level of sophistication in terms of distinguishing between nearly identical brands.

130.    In light of the lack of any evidence that individual golf cart purchasers are sophisticated in a way that would help them avoid the likelihood of confusion at issue here, the Court concludes that the end users of golf carts are most likely to be simply a

"typical buyer exercising ordinary caution" of the type that courts find are likely to be confused by similar marks.  *See RE/MAX Int'l, Inc. v Trendsetter Realty, LLC*, 655 F. Supp. 2d 679, 707 (S.D. Tex. 2009). This factor therefore weighs in favor of a likelihood of confusion.

**<u>Weighing the Factors</u>**

131.    The digits of confusion "are not elements of a plaintiff's cause of action, but instead comprise a nonexhaustive collection of considerations that may be relevant to the ultimate factual determination—Are the actions of the defendant likely to create confusion?" *Society of Financial Examiners v. Nat'l Assn. of Certified Fraud Examiners Inc.*, 41 F.3d 223, 228 n.15 (5th Cir. 1995).

132.    If the likelihood of confusion analysis is closely balanced, the question should be resolved in favor of the senior user. *Am. Century Proprietary Holdings, Inc. v. Am. Century Cas. Co.*, 295 Fed. Appx. 630, 638 (5th Cir. 2008); *Homax Prods., Inc. v. Homax, Inc.*, 2009 WL 7808951, at *13 (S.D. Tex. Aug. 5, 2009).

133.    The Court concludes that the likelihood of confusion factors in this case weigh uniformly in favor of a finding of likelihood of confusion. Accordingly, the Court finds that Trojan Battery has established the likelihood of confusion element of Counts I-IV of its Complaint as to Trojan EV and Golf Carts of Cypress.

134.    The Court further finds no basis to find one company liable for trademark infringement and not the other. Defendants argued at trial that certain evidence (such as authorized dealer agreements and emails sent to the Trojan EV website) could be considered only against Trojan EV and not Golf Carts of Cypress. But that argument does

not account for the nature of the inquiry here, which is whether the defendant's use of the infringing mark is likely to cause confusion. *See* 15 U.S.C. § 1115. The evidence of overlapping dealers is relevant to Golf Carts of Cypress not because Golf Carts of Cypress is a party to those dealer agreements, but because it informs the analysis of how consumers are likely to perceive Golf Carts of Cypress's use of the Trojan-EV mark.

135.    In a similar vein, it is relevant to likelihood of confusion that consumers will see Trojan-EV advertisements in the same place as TROJAN® battery advertisements, whether or not Golf Carts of Cypress was the one the placed the ads. There is no dispute that Golf Carts of Cypress in fact uses the Trojan-EV name on golf carts (and in advertising on its website and social media), and therefore the other evidence of how the mark is perceived by consumers is properly considered against both Defendants.

136.    Finally, as to evidence of actual confusion, Mr. Nell testified that he had access to the info@trojanev.com email address at which the emails were received. As the owner of Golf Carts of Cypress with managerial authority over that company, Mr. Nell's knowledge of the actual confusion is likewise imputed to Golf Carts of Cypress. *United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*, 848 F.3d 366, 374 (5th Cir. 2017) (discussing common law principles of imputation).

137.    Accordingly, the Court finds both Trojan EV and Golf Carts of Cypress liable for trademark infringement and unfair competition under Counts I-IV.

**Defendants' Unclean Hands Defense**

138.     Defendants assert that the Trojan Battery Company comes to the Court seeking equitable relief (a permanent injunction and infringer profits) with unclean hands because it has used exclusivity agreements between itself and its master distributors to create higher prices for TROJAN® brand products.

139.     Defendants bear the burden to establish unclean hands. To be viable, an unclean hands defense must be "directly related to the merits of the controversy between the parties," meaning that the alleged conduct "affect[s] the equitable relations between the parties in respect of something brought before the court for adjudication." *Mitchell Bros. Film Grp. v. Cinema Adult Theater*, 604 F.2d 852, 863 (5th Cir. 1979).

140.     Thus, an unclean hands defense fails unless the alleged conduct by the plaintiff has "changed the equitable relationship between plaintiffs and defendants." *Mitchell Bros.*, 604 F.2d at 863.

141.     Here, Defendants have not established that the alleged conduct—selling batteries through master distributors who each have exclusive territories for TROJAN® batteries—harms Defendants or affects the equitable relations between the parties, and therefore for at least that reason the defense lacks merit. *Mitchell Bros.*, 604 F.2d at 863.

**<u>Trojan Battery Is Entitled to Disgorgement of Defendants' Profits</u>**

142.     Under 15 U.S.C. § 1117(a), where a defendant is found liable for infringement, "the plaintiff shall be entitled, subject to the provisions of sections 1111

and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."

143.    Under Section 1117(a), a plaintiff may recover an infringing defendant's profits on a theory of disgorgement of the defendant's unjustly obtained profits, thus making infringement unprofitable. *Maltina Corp. v. Cawy Bottling Co.*, 613 F.2d 582, 585 (5th Cir. 1980) (citing *Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117, 120 (9th Cir. 1968)).

144.    "[T]he purpose of section 1117 is to take all the economic incentive out of trademark infringement." *Am. Rice*, 518 F.3d at 340.

145.    The Fifth Circuit has "held it appropriate to award profits of an infringer pursuant to § 1117(a) for various purposes: to compensate for diverted sales, to remedy unjust enrichment of the infringer, or to deter future infringement." *Am. Rice*, 518 F.3d at 340.

146.    In determining whether the "principles of equity" support disgorgement, "factors to be considered include, but are not limited to[,] (1) whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off." *Am. Rice*, 518 F.3d at 338.

147.    While the defendant's intent to confuse or deceive is a factor to be considered in the disgorgement analysis, a finding of willfulness is not required for disgorging profits under the Lanham Act. *Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S.

90

Ct. 1492, 1497 (2020). The Supreme Court has cautioned that merely "acknowledging" the relevance of a defendant's mental state "is a far cry from insisting on [willfulness as an] inflexible precondition to recovery." *Id. a*t 1497.

148.    The Court finds that Defendants' mental states sufficiently warrant disgorgement of the profits Defendants received from their sale of the infringing Trojan-branded golf carts (and related services). The evidence at trial revealed that Defendants continued to sell the infringing products, and even purchased additional Trojan-branded golf carts and components from overseas suppliers, long after they became aware of Plaintiff's Trojan marks via a cease-and-desist letter sent to them by Plaintiff in July of 2021. Moreover, plaintiff put forth evidence of confused consumers, as well as confused dealers. Tellingly, the instances of consumer and dealer confusion included emails received by Defendants directly. Such consumer confusion is not surprising, given the similarity of the marks.

149.    Defendants' continued sales despite their knowledge of consumer confusion with Plaintiff's nearly identical marks is indicative of an improper motive. *See Monster Energy Co. v. Integrated Supply Network, LLC*, 533 F. Supp. 3d 928, 933 (C.D. Cal. 2021) (finding willfulness where "[d]efendant continued to sell the infringing products after it received [p]laintiff's cease and desist letters and after [p]laintiff filed the instant lawsuit"); *Color Me Mine Enters. Inc. v. S. States Mktg. Inc.*, 2013 WL 12119715, at *11 (C.D. Cal. Apr. 25, 2013) (finding a triable issue of fact as to willfulness where defendant continued to sell infringing product despite knowledge of plaintiff's mark and the likelihood of consumer confusion).

91

150.    In addition, there is some evidence that Trojan Battery may have already lost sales or be at risk of having sales diverted based on the likelihood of confusion. Two emails received by Defendant Trojan EV through its website referred to seeking to purchase batteries from Trojan EV.. The Court finds that this factor likewise weighs in favor of disgorgement.

151.    The Court also finds that the inadequacy of other remedies and the public interest in making the misconduct unprofitable weigh heavily in favor of an infringer profit award here. While a permanent injunction will stop future harm to the TROJAN® brand, it will do little to deter willful infringers like Defendants from doing so again. *Maltina Corp.*, 613 F.2d at 585 ("An injunction alone will not adequately deter future infringement."). It is particularly compelling that in this case, after being "forced" to stop selling the Model A Trojan-EV golf cart, Defendants invested—after this lawsuit was filed—in a new golf cart branded Trojan-EV. The only reasonable conclusion to draw is that Defendants believed that the Trojan-EV name had significant value and would generate significant profits over another brand without the name recognition of TROJAN® in the golf cart space. Relief limited to an injunction would simply encourage parties to do what Defendants did—infringe willfully, collect the unjust profits, and then move on (with profits in hand). *See Maltina Corp.*, 613 F.2d at 585 ("In short, we find the district court properly ordered Cawy to account to the plaintiffs for the profits it earned from its willful infringement. This accounting serves two purposes: remedying unjust enrichment and deterring future infringement.")

152.    On balance, the Court concludes that disgorgement of Defendants' profits is warranted here based on Defendants' willful infringement, the need to deter willful infringement in the future, Trojan Battery's swiftness in putting Defendants on notice and asserting its rights, and the interest in making willful infringement unprofitable.

## Calculation of Profits Subject to Disgorgement

153.    In showing the amount of profits subject to disgorgement, the plaintiff's burden is to prove the defendant's sales only; defendant must prove all elements of cost or deduction claimed. 15 U.S.C. § 1117(a). "Any doubt as to the computation of costs or profits is to be resolved in favor of the plaintiff." *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 515 (9th Cir. 1985). Moreover, it is the defendant's burden to "prove that sales were demonstrably not attributable to the infringing mark." *Nintendo of Am., Inc. v. Dragon Pac. Int'l*, 40 F.3d 1007, 1012 (9th Cir. 1994). "If he does not do so, the profits made on sales of goods bearing the infringing mark properly belong to the owner of the mark." *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co*., 316 U.S. 203, 206–07 (1942). It is appropriate "to assume that the wrongdoer who makes profits from the sales of goods bearing a market belonging to another was enabled to do so because he was drawing upon the good will generated by that mark." *Id.* at 207; *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 555 (5th Cir. 1998) ("The [Supreme] Court acknowledged that the plaintiff may receive a windfall, but stated that, 'where it is impossible to isolate the profits' from the infringing conduct, the windfall should go to the plaintiff rather than the wrongdoer.").

154.    "Disgorgement of profits 'is intended to award profits only on sales that are attributable to the infringing conduct.'" *Vital Pharms. v. PHD Mktg.*, No. CV 20-06745-RSWL-JCx, 2022 U.S. Dist. LEXIS 133012, at *15-16 (C.D. Cal. Jul. 26, 2022) (quoting *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993)). "However, once the plaintiff demonstrates gross profits, they are presumed to be the result of the infringing activity. It is therefore the defendant's burden to demonstrate which of its total sales are not attributable to the infringing activity. District courts should not apportion profits where they cannot do so based on a reasonable, nonspeculative formula." *Id*. at *16 (internal citations and quotations omitted).

**Trojan EV's Profits**

155.    The evidence establishes that Trojan EV generated profits of $1,187,699 from the sale of Trojan-branded golf carts in the period spanning January 1, 2021 to October 13, 2022. The Court finds that Trojan EV has not established that it is entitled to any deductions in the Court's calculation for "mold fees" or "total expenses."

156.    The Court thus awards Plaintiff a total of $1,187,699 in disgorged profits from Trojan EV. This calculation takes into account the relevant costs and deductions from its revenues established at trial under 15 U.S.C. § 1117(a)

**Golf Carts of Cypress's Profits**

157.    The evidence shows that Golf Carts of Cypress generated profits of $1,422,727 from the sale of Trojan-branded golf carts in the period spanning January 1,

2021 to September 30, 2022. The Court finds that Cypress has not established that it is

entitled to deductions in this calculation for "shipping costs" of approximately $975/unit.

158.   The Court awards Plaintiff a total of $1,422,727 in disgorged profits from

Golf Carts of Cypress. This calculation takes into account the relevant costs and

deductions from its revenues established at trial under 15 U.S.C. § 1117(a)

**Trojan Battery is Entitled to a Permanent Injunction**

159.   To award Plaintiff a permanent injunction, the Court must find that

(i) Plaintiffs have suffered irreparable injury; (ii) legal remedies are inadequate to

compensate Plaintiffs for the injury; (iii) the balance of the hardships favors an

injunction; and (iv) the public interest would be served by an injunction. *See eBay, Inc. v.*

*MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Under 15 U.S.C. § 1116, this Court

has the power to grant "injunctions according to the principles of equity and upon such

terms as the court may deem reasonable, to prevent the violation" of Plaintiff's rights as

owners of its trademarks.

160.   "Injunctive relief is the remedy of choice for trademark and unfair

competition cases, since there is no adequate remedy at law of the injunction caused by a

defendant's continuing infringement." *Century 21 Real Est. Corp. v. Sandlin*, 846 F.2d

1175, 1180 (9th Cir. 1988); *see also* 5 McCarthy on Trademarks & Unfair Competition

§ 30:1 (5th Ed.) ("A permanent injunction is the usual and normal remedy once

trademark infringement has been found in a final judgment.").

161.   "If an injunction were denied, the court would be telling plaintiff to sit by

and watch defendant continue to violate the law and infringe upon plaintiff's rights until

such time as plaintiff decided to sue again for money damages as compensation for the past injury incurred." 5 McCarthy on Trademarks and Unfair Competition § 30:2.

162.    A plaintiff seeking an injunction is entitled to a rebuttable presumption of irreparable harm upon a finding of trademark infringement. 15 U.S.C. § 1116(a). Accordingly, because the Court concludes that Defendants are liable for trademark infringement, the Defendants have the burden to rebut the presumption of irreparable harm.

163.    Defendants did not rebut Plaintiff's showing of irreparable harm. Furthermore, the loss of control over the Plaintiff's brand that comes from a third-party using a confusingly similar mark in commerce establishes irreparable harm and a lack of adequate remedy at law. *Gibson Brands, Inc. v. Armadillo Distribution Enters., Inc.*, 2022 WL 3008501, at *3 (E.D. Tex. July 28, 2022); *Choice Hotels Int'l, Inc. v. Patel*, 940 F. Supp. 2d 532, 543 (S.D. Tex. 2013).

164.    The Court finds that Trojan Battery's decision not to move for a preliminary injunction does not constitute "delay" in asserting its rights or evidences a lack of irreparable harm. Trojan Battery could have reasonably determined that a permanent injunction plus an infringer profits remedy at the end of the case would provide a suitable remedy, particularly where, at the outset of the case, Trojan Battery had imperfect information about the scope of Trojan EV's dealer network and infringing activities. *See Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 104 n.20 (2d Cir. 2012) ("[T]he failure to seek a preliminary injunction in a case of infringement is not

96

generally considered a factor that weighs against a plaintiff seeking permanent injunctive relief.").

165.   Under the facts established by the evidence at trial the Court finds that money damages are inadequate to compensate Plaintiff for Defendants' continuing acts of infringement. *See Gibson Brands, Inc.* 2022 WL 3008501, at *3 (quoting *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 627 (5th Cir. 2013).

166.   A permanent injunction reduces the need for multiple lawsuits and prevents future infringement. *Gibson Brands, Inc.* 2022 WL 3008501, at *3. "A plaintiff's loss of control over the quality of products being associated with its mark and the resulting damages to its goodwill could not easily be quantified or undone by monetary damages." *Gruma Corp. v. Mexican Restaurants, Inc.*, 2013 WL 12134147, at *7. In addition, "[d]enying the injunction would force [Trojan Battery] to either continually sue [Defendants] for damages that are difficult to prove or endure continued infringement and dilution" of its trademarks. *Id.*

167.   Moreover, Trojan EV's claim of hardship is based solely on the alleged need to replace molds purchased to make the Trojan-EV-X golf cart. The Court does not weigh these costs as a "hardship" because those costs were incurred after Defendants were on notice of their infringement, both through Trojan Battery's cease and desist letter and the filing of this lawsuit. *See Quantum Fitness Corp*, 83 F. Supp. 2d at 832 (claim of hardship "undercut" when based on costs incurred after notice of "trademark grievances"). And in any event, "even extreme financial hardship shown by an infringer

does not necessarily prevent the issuance of an injunction." *Vesta Corp.*, 2016 WL 8710440, at *15 (injunction despite $300,000 cost for infringer to rebrand).

168.   "The public interest is always served by requiring compliance with Congressional statutes such as the Lanham Act and by enjoining the use of infringing marks.".

169.   Although the Defendants have argued that they should be allowed to continue to use the Trojan EV name while adding a disclaimer to the Trojan EV website, the Court finds that there is no evidence that a disclaimer would eliminate the likelihood of confusion in this case. Although the Fifth Circuit has not ruled directly on this point, courts in this Circuit place the burden on the defendant to show that a disclaimer would "significantly reduce the likelihood of consumer confusion." *Westchester Media Co., L.P. v. PRL USA Holdings, Inc.*, 2001 WL 34109374, at *3 (S.D. Tex. Oct. 23, 2001), *affd.* 48 Fed. Appx. 917 (5th Cir. 2002); *Pebble Beach Co. v. Tour 18 I, Ltd.*, 942 F. Supp. 1513, 1551 (S.D. Tex. 1996) ("Additionally, some courts have placed the burden on the defendant to provide evidence establishing that its disclaimers are effective.").

170.   Defendants have not established that a disclaimer placed on the Trojan EV website and marketing materials would be effective. The Fifth Circuit has generally only allowed disclaimers in place of an injunction where First Amendment interests in protecting "expressive" content "counsel[] against an outright ban." *Abraham*, 708 F.3d at 628. Defendants' use of Trojan EV is a classic commercial use, and they do not argue that they have any "expressive" reason or First Amendment interest in using Trojan EV on golf carts. Rather, their use is purely commercial.

171.    Moreover, "the mere presence of a disclaimer does not necessarily prevent consumer confusion." *Pebble Beach Co. v. Tour 18 I, Ltd.*, 942 F. Supp. 1513, 1550 (S.D. Tex. 1996), *aff'd as modified*, 155 F.3d 526 (5th Cir. 1998). Here, for example, by using the Trojan EV name to draw potential customers to its websites, Defendants will have already succeeded in their aim, whether the potential purchasers see the disclaimer or not. That is demonstrated by Mr. Malloy, who was initially confused into believing the Trojan EV was affiliated with Trojan Battery. Although Mr. Malloy's confusion was dispelled after visiting the website, it succeeded in benefiting the Defendants because Mr. Malloy clicked the 'Become a Dealer' link, went through the process of filling out a New Authorized Dealer Interest form and signing a Confidentiality Agreement, and received the Trojan EV price list. That is precisely the sort of confusion that a disclaimer would not prevent. *See Elvis Presley Enters.*, 141 F.3d at 204 (initial confusion "succeeded" in getting consumers in the door, even though they realized lack of affiliation after entering, because "some patrons may stay").

172.    Just as importantly, there is little reason to think that a disclaimer would have any effect on end consumers—i.e., buyers of golf carts. Those buyers are likely to encounter Trojan EV golf carts not on Trojan EV's websites (and maybe not on the internet at all), but at retail stores that sell golf carts, often in close proximity to TROJAN® batteries. A disclaimer that does not reach the very people likely to be confused cannot have any material effect and is therefore unlikely to remedy the type of confusion or irreparable harm at issue here.

173.   In sum, there is no evidence that a disclaimer would be sufficient to avoid the likelihood of confusion created by Defendants' use of the highly similar Trojan EV mark on highly similar goods. The Court concludes that a permanent injunction must issue and will enter a separate injunction order.

## **CONCLUSION**

174.   In summary, the Court finds as follows:

    a.   Defendant Trojan EV, LLC is found liable under Counts I-IV based on its infringement of Trojan Battery Company's registered and common law trademarks for TROJAN, TROJAN BATTERY SALES, and the  logo.

    b.    Defendant Golf Carts of Cypress, LLC is found liable under Counts I-IV based on its infringement of Trojan Battery Company's registered and common law trademarks for TROJAN, TROJAN BATTERY SALES, and the  logo.

    c.   Defendants are permanently enjoined from further infringement of Plaintiff's trademarks, as set forth in the separately filed Permanent Injunction.

    d.   Disgorgement of Defendants' profits is necessary and appropriate to make Defendants' infringement unprofitable, avoid unjust enrichment, and deter future willful infringement.

e. The Court awards infringer profits under 15 U.S.C. § 1117(a) in favor of Trojan Battery and against Trojan EV, LLC in the amount of $1,187,699. This calculation takes into account the relevant costs and deductions from its revenues established at trial under 15 U.S.C. § 1117(a).

f. The Court awards infringer profits under 15 U.S.C. § 1117(a) in favor of Trojan Battery and against Golf Carts of Cypress, LLC in the amount of $1,422,727. This calculation takes into account the relevant costs and deductions from its revenues established at trial under 15 U.S.C. § 1117(a).

g. Trojan EV, LLC shall produce within 7 days documents sufficient to calculate their respective revenues, costs and profits from the sale of Trojan-branded golf carts from October 13, 2022 (the date of the experts' analyses) through the date that the injunction is to take effect.

h. Golf Carts of Cypress, LLC shall produce within 7 days documents sufficient to calculate their respective revenues, costs and profits of Trojan-branded golf carts from October 1, 2022 (the date of the experts' analyses) through the date that the injunction is to take effect.

i. The parties shall make within 30 days after the Defendants' production referred to above a joint submission identifying the

additional profits subject to disgorgement, and identifying any

disagreements that need to be resolved by the Court.

SIGNED at Houston, Texas on March 28, 2024.

GEORGE C. HANKS, JR.
UNITED STATES DISTRICT JUDGE